Filed Feb. 18, 1892.

---

No. 420.

## Shover, Administrator, et al. *v.* Myrick.

Contract.—*Care and Support.*—*Breach of.*—*Measure of Damages.*—*Expectancy of Life.*—*Claim Against Estate.*—Where a mother deeded to her daughter an interest in a certain farm in consideration of the daughter's agreement to support and care for her during the remainder of her lifetime, the contract for care and support was a continuing one, and upon a breach thereof the mother had a right to recover full and final damages, including the entire expense for such support and care, not only from the date of the breach to the commencement of the action, but during the remainder of her life. It is immaterial whether the breach occurred from some cause during the life of the daughter, or, as in this instance, because of her death. In the latter case the remedy would be against her estate. The value of the support yet due the mother is not to be measured by the value of the lands she conveyed to her daughter in consideration of such support.

Same.—*Excessive Allowance.*—*What is not.*—Where the breach occurred when the mother was advanced in years, and the evidence showed that until

the end of her expectancy of life there would be a period of at least five years of a failure to maintain and support her, and that such care and support was worth $192 a year, an allowance of $800 against the daughter's estate can not be regarded as an excessive allowance.

SAME.—*Consideration.*—*Indeterminate Value.*—*Fraud.*—Where the consideration of a contract is agreed upon between the parties, and the same is of an indeterminate value, the courts will not substitute their judgment for that of the parties, but will uphold the contract unless it be tainted with fraud.

EVIDENCE.—*Expert Witness as to Probable Longevity.*—*Mortality Tables.*—*Refreshing Recollection.*—It was not error for the court to permit certain standard mortality tables to be made use of upon the trial to refresh the memory of a witness who had been placed upon the stand as an expert upon the subject of life insurance, and the probable longevity of a person at a certain age.

SAME.—*Probable Longevity.*— *Introduction of Standard Mortality Tables.*— Standard tables, such as the "American Mortality Tables," showing mortality rates and expectancies of human lives at certain ages and under certain conditions, and probable longevity, as well as the present worth of annuities, etc., may be read in evidence under proper instructions as to their use, in cases involving such controversies. As to the various modes in which life expectancy may be proved, see latter part. of opinion.

From the Marion Circuit Court.

*H. J. Everett,* for appellants.

*V. Carter,* for appellee.

REINHARD, J.—This appeal is taken from the allowance of a claim filed against the estate of Henrietta Hubbard, deceased.

The facts upon which the claim rests are as follows: Henrietta Hubbard, the decedent, and Jesse Hubbard, the appellant, were husband and wife, and Dolly Myrick, the appellee, was the mother of Henrietta. In 1883 the appellee was the owner of an undivided third part of a forty-acre tract of land in Morgan county, Indiana, as the widow of her deceased husband, and the decedent and her brothers and sisters were the owners of the remaining two-thirds of said tract. At that time the appellee and her said daughter Henrietta entered into an agreement by which the latter under-

Shover, Administrator, *et al. v.* Myrick.

took to support and care for her mother during the remainder of her lifetime, in consideration of which the appellee conveyed to Henrietta her interest in said farm. Shortly afterwards Henrietta purchased of her brothers and sisters the residue of the farm, thus becoming the owner of the entire forty acres. The appellee commenced living with her daughter at that time, and continued to do so until October 31st, 1889, when Henrietta died. The husband of Henrietta then broke up housekeeping, and ceased to provide and care for the appellee, and she left his family and went elsewhere to seek a livelihood. The appellant Shover was appointed administrator of the estate of said decedent, and the appellee filed her claim against said estate, demanding an allowance in some adequate amount for the value of the care and support due her from her daughter during the residue of the claimant's life.

The cause was tried by the court, and an allowance was made the appellee of $800.

The appellant Hubbard, as the surviving husband and heir of the decedent, joined in the defence, and appeals under section 2454, R. S. 1881. The administrator, on the 7th day of January, 1891, dismissed his appeal, and the same is therefore now prosecuted by Hubbard alone.

The only error assigned is the overruling of the motion for a new trial.

Two reasons are urged why that motion should have been sustained, viz.: 1. Because the allowance is excessive; and, 2. Because the court erred in admitting testimony as to what the mortality tables show is the expectancy in a term of life at the age of 80 and 81 years.

The evidence tends to prove that according to the established mortality rates, as gathered from tables prepared by life insurance companies, a person in good health at the age of 80 years has an expectancy of $4\frac{4}{10}$ years, and at the age of 81 years of $4\frac{1}{10}$ years. The evidence also tended to

show that the appellee was about 81 years old at the time of the trial and in good health for a person of that age.

From the time Henrietta Hubbard died, viz.: October 31, 1889, until the end of the appellee's expectancy, there would be a period of at least five years of a failure to maintain and support the appellee, as was agreed upon in her contract with her daughter. An allowance of $800 for five years would be equivalent to $160 per year. There was evidence that it would be worth from $16 to $25 per month to furnish such support. At an estimate of $16 per month the value of the services and support for a year would amount to $192, and for five years to $960. We think, therefore, the evidence abundantly sustains the finding as to amount. We can not agree with the appellants' counsel that the value of the support yet due Mrs. Myrick must be measured by the value of the lands she conveyed to her daughter in consideration of such support. We presume if the appellee had died a few days after the contract was entered into, her other heirs would not have been in any position to claim a portion of the land, or its equivalent, because of the inadequacy of the consideration. Neither can the representatives of the decedent now claim that because of the long duration of appellee's life there should be a diminution of the liability to support and care for her. If such a rule were to obtain, there is no reason why the appellee could not have been turned out at the end of the first year, if it could have been shown that a year's support was all the appellee's interest in her farm was worth. There is neither reason nor justice in such a construction, and no authority has been referred to which it is claimed sustains the doctrine contended for. On the other hand, it is well settled that where the consideration of a contract is agreed upon between the parties and the same is of an indeterminate value, the courts will not substitute their judgment for that of the parties, but will uphold the contract unless it be tainted with fraud. *Keller* v. *Orr,* 106 Ind. 406 ; *Price* v. *Jones,* 105 Ind. 543 ; *Vigo,*

*etc., Society* v. *Brumfiel,* 102 Ind. 146 ; *Wolford* v. *Powers,* 85 Ind. 294.

When the decedent entered into the agreement and received from her mother the conveyance of the land, she accepted the terms thereof, including both that which was beneficial and that which was burdensome. Her contract to support and care for the appellee was a continuing one, and upon a breach thereof the latter had a right to recover full and final damages, including the entire expense for such support and care, not only to the time of the commencement of the action, but during the remainder of her life. *Schell* v. *Plumb,* 55 N. Y. 592. This must be true, whether the breach arose from some cause during the life of the decedent or because of her death. In the latter case the remedy is, of course, against her estate. The measure of damages for such breach is the value of the support and care from the time of the breach, which, in this case, is the time of the intestate's death, to the day of the trial, and the present worth of such support and care from the day of the trial to the end of the life in question.

This brings us to the consideration of the second point relied on by the appellant for the reversal of this cause, viz.: The admission of testimony in reference to the appellee's expectancy.

The question we are called upon to determine is as to the proper mode of proving the present value of what is equivalent to an annuity for life. In the present case, as we have already seen, the evidence was that it was worth at least $16 per month to support and care for the appellee, and that her age was about eighty-one years. If we accept the lowest estimate, then, as the correct one, the appellee was entitled to a life annuity, chargeable to the estate of her deceased daughter, of $192. What was the correct method of establishing the present worth of this annuity? It appears from the record that certain "American Mortality Tables" were made use of upon the trial, not strictly as a matter of evi-

dence, perhaps, but to refresh the memory of a witness who had been placed upon the stand as an expert upon the subject of life insurance, and the probable longevity of a person at a certain age. The witness, having shown himself competent to testify in relation to the subject under investigation, was permitted to state, over the appellant's objection and exception, that a person in good health at the age of eighty years had an expectation of $4\frac{4}{16}$ years, and at the age of eighty-one years had an expectation of $4\frac{1}{16}$ years. The appellant insists that this was error.

The inquiry is one of more than ordinary importance, and we can not but regret our inability to find some precedent in the decisions of our Supreme Court. Disputed questions constantly arise in which it becomes necessary to settle in some legal manner the present worth of estates maturing in the future. Besides the case presented by this appeal, there are those where life-estates have to be sold to make cash assets; or where the value of the estate of one who takes after a life in being is to be ascertained; or where a sum of money is directed to be paid after the death of a person then living, and it is sought to find its present value; or where the present worth of a life policy is to be established. In these and in all other controversies where the entire body of an estate is to be disposed of at once in proportion to certain interests in the same, depending upon some future contingency or contingencies, it frequently devolves upon courts and juries to deal with this problem. Of course it is impossible, even with our present advanced facilities in vital statistics, to arrive at anything like exactness in results in these adjustments. The most and the best that can be done is to approximate as nearly as may be a correct conclusion.

The use of life and annuity tables has long been resorted to by the courts of this country and England in making estimates of present values. The business of life insurance and the sale of annuities by societies and corporations proved to be so successful among our British ancestors that the gov-

ernment itself, by the statute of 5 W. & M., ch. 5 and 20, assumed the undertaking for the purpose of raising some of its revenues. Statistics concerning the longevity of human lives were necessary, therefore, to estimate the required charges for such protection, and these statistics were gradually arranged by mathematicians into "tables," from which the average duration of life at certain ages and conditions could be ascertained with reasonable certainty. Between the years 1735 and 1780 Dr. Richard Price, of England, prepared his celebrated "Northampton Tables" from bills of mortality kept in the parish of All Saints, a town in the North of England, and during the years 1779 and 1780 the "Carlisle Tables" were framed for the town of Carlisle, also in the north of England, from observations made upon a population of 8,000 persons. In addition to these there are the "Equitable Tables," prepared by the Equitable Insurance Company, of London; the "Sweden Tables," based upon estimates of mortality among the populations of Sweden and Finland; "Finlaison's Tables," made by John Finlaison, under the direction of the British government; "McKean's Tables," by Alexander McKean, actuary, of London, and others. "Wigglesworth's Tables," prepared by Dr. Wigglesworth, were prepared from observations made in New England, and "Bland's Tables" were arranged by Chancellor Bland, of Maryland, from other tables. See *Williams's Case*, 3 Bland Ch. Rep. 196 (227); 2 Edinburgh Encyc., tit. "Annuities," p. 150 *et seq.;* 2 Encyc. Brit., tit. "Annuities," p. 72 *et seq.; Estabrook* v. *Hapgood*, 10 Mass. 313 (315).

These tables are regarded as standard and authoritative data for making estimates of the character of those under consideration and have long been used in different ways by the courts of Great Britain and America as among the most available means for the equitable adjustment of such controversies. In the statistical reports of the United States Census office, upon the taking of every census, there are pub-

lished by the government certain tabulated statements of mortality among different groups of the population of the. United States, including tables showing the expectation of lives at all ages and among various classes of population. These statements are based upon the experience and observation of scientific men, and form a portion of the vital statistics as well as of the current history of the country. · They are known as the " Mortality Tables of the United States," or as "American Mortality Tables." It seems to be well established that of the contents of these tables the courts will take judicial knowledge. Whart. Ev., section 282, and notes; *Gordon, etc., Co.* v. *Tweedy,* 74 Ala. 232. It is also held to be proper to introduce such tables as those above named and others recognized as standards and proved to be such, in evidence, and permit them to be used as such by the court or jury. Thus it was held by the Supreme Court of the United States, in an action for personal injury against a railroad company, that so far as it is susceptible of an estimate in money for the loss and damage caused him by the defendant's negligence in impairing the plaintiff's ability to make a livelihood, standard life and annuity tables may be put in evidence for the consideration of the jury, although they are not to be treated as absolute guides to control their decision. *Vicksburg, etc., R. R. Co.* v. *Putnam,* 118 U. S. 545. And in a Vermont case it was decided that where the plaintiff proves an outstanding life-estate as a breach of the covenant of seisin, and gives evidence as to the age and general health of the tenant for life and the annual value of the premises, it is not error for the court to allow Dr. Wigglesworth's tables for estimating life estates to be used by the jury in computing the damages, under proper instructions in regard to the use to be made of them. *Mills* v. *Catlin,* 22 Vt. 98.

In *Sauter* v. *New York, etc., R. R. Co.,* 66 N. Y. 50, which was an action for negligently causing the death of a person, it was adjudged that the Northampton tables were competent

evidence to prove the probable duration of life of the deceased, which is an element in estimating the damages.

In *Donaldson* v. *Mississippi, etc., R. R. Co.*, 18 Iowa, 280, the Carlisle tables were held to be admissible in evidence, having been shown to be standard tables upon the subjects upon which they treat, and that they were competent to prove the expectation of life. To the same effect are *Walters* v. *Chicago, etc., R. R. Co.*, 41 Iowa, 71 ; *Central R. R. Co.* v. *Crosby*, 74 Ga. 737 ; *McKeigue* v. *City of Janesville*, 68 Wis. 50 ; *Central R. R. Co.* v. *Richards*, 62 Ga. 306.

In Iowa it is held that the " Encyclopædia Britannica," containing the " Carlisle Life Tables," may be introduced in evidence in a proper case. *Worden* v. *Humeston, etc., R. W. Co.*, 76 Iowa, 310 ; *Haden* v. *Sioux City, etc., R. R. Co.*, (Iowa) 27 N. W. Rep. 733.

The practice resorted to in the present case was that of asking an expert witness his opinion as to the probable duration of a healthy life at the ages of eighty and eighty-one years, based upon his own knowledge and observations, as well as upon the tables before him, which he had identified as standard tables used in the business of life insurance.

Expert witnesses may testify and give information based upon scientific and statistical facts, and in doing so they may refresh their recollections by references to books, tables or other sources from which such knowledge is usually derived. 1 Whart. Ev., section 666. It has been held that stockbrokers, whose business is that of buying and selling life annuities, and who are acquainted with the values of the same, are competent to testify as to the value of an annuity for the life of a person of a certain age. *Heathcote* v. *Paignon*, 2 Brown Ch. 167. And it is said that actuaries and accountants, experienced in life insurance business, are competent to testify as to the value of annuities and average duration of lives, and for the purpose of refreshing the memory, witnesses are permitted to refer to standard tables used by life insurance companies for determining those questions. Rogers

Exp. Test., section 160, and n.; *Rowley* v. *London, etc., R. W. Co.,* 8 L. R. Exch. 221; *Shippen and Robbins's Appeal,* 80 Pa. St. 391.

In our own State it has been repeatedly held that experts may testify and give their opinions and conclusions arrived at from the study and examination of books as well as from their own experiences and observations, and that scientific books, etc., may be referred to by them to refresh their recollection, though medical works may not be introduced in evidence. *Carter* v. *State,* 2 Ind. 617; *Davis* v. *State,* 35 Ind. 496; *Hess* v. *Lowrey,* 122 Ind. 225.

And it is also settled now in this State that where books or records that might be properly used in evidence are voluminous, it is competent for experts who have examined them to testify as to the results of such examination with regard to the subject under investigation. *Hollingsworth* v. *State,* 111 Ind. 289; *Culver* v. *Marks,* 122 Ind. 554.

It seems, however, that as to "books of exact science, in which conclusions from certain and constant data are reached by processes too intricate to be elucidated by a witness," and when it is shown that such books have been accepted as standards upon the particular subject under examination, they are admitted as evidence. For these reasons the Carlisle, Northampton and other standard tables containing mortuary statistics and calculations have been admitted as proper evidence to prove the statements and estimates which they contain. 1 Whart. Ev., section 667; Rogers Exp. Test., section 163.

From what has been said we think it fairly deducible that proof of the probable longevity of a person of a given age and conditions, as well as the present value, annuities and estates depending upon future contingencies, may be effected in any or all of the following ways:

1. The court may take judicial knowledge of the United States Mortality Tables, and, perhaps, other standard tables of the kind and character heretofore spoken of.

2. Standard tables, showing mortality rates and expectancies of human lives at certain ages and under certain conditions, and probable longevity, as well as the present worth of annuities, etc., may be used as evidence, under proper instructions as to their use, in the trial of causes involving such controversies as those hereinbefore alluded to.

3. Expert witnesses may testify as to results and conclusions arrived at by them with reference to these subjects, and such witnesses may refer to the tables and data upon which their knowledge is based, in whole or in part, as a means of refreshing their memories.

In the case at bar there is nothing to show that the court transcended its power in the admission of the evidence objected to. None of the evidence given was necessarily conclusive. These sources of proof, as has been before stated, are not expected to lead to absolutely accurate results. The very name sometimes given these subjects—" the doctrine of chances "—indicates an absence of certainty. The court had before it sufficient data upon which to base the conclusion arrived at. It had the opinion of the witness, the tables before it, the age and condition of the appellee, and all other facts necessary to form an intelligent and satisfactory judgment. We must assume that all these facts and circumstances were considered by the court in making its estimate of the *quasi* annuity that was coming to the appellee. It must be remembered, too, that the sum to be found was the then *present* value of something that had not fully matured and that proper discount was to be made upon all future installments. In view of all these considerations it seems to us that the result reached is fair and equitable, and that the appellant has no just cause for complaint. We find no error either in the admission of evidence or in the amount of the finding, and are of the opinion that the motion for a new trial was correctly overruled.

The judgment is affirmed.

Filed Feb. 18, 1892.