BELMER v. BOYNE CITY TANNING CO.

1. MASTER AND SERVANT—INFANCY—NEGLIGENCE—ASSUMPTION OF RISK—HAZARDOUS EMPLOYMENT.
   In an action for negligence, brought by a minor under 16 years of age against his employer, on the ground that he was ordered to undertake hazardous work outside the scope of his duties, and was injured in attempting to turn a pulley while standing on it, as directed by a superior servant who was making an adjustment, the questions of unavoidable accident, assumption of risk, and whether the plaintiff was expressly directed to do the work in the way adopted, were questions of fact for the jury.

2. SAME—FELLOW-SERVANT—ALTER EGO.
   The fact that one employé has authority to hire and discharge other employés is not conclusive of his relation of fellow servant to other employés.

3. SAME—REPRESENTATIVE OF MASTER.

Where a servant is exposed to danger not in the line of duty which he has engaged to perform, by the act of a superior servant, having authority over him, the negligence of the superior may be treated as that of the master.

4. SAME — CONTRIBUTORY NEGLIGENCE — ASSUMPTION OF RISK — MINOR SERVANT.

The age of the plaintiff, and his tendency to defer to the judgment of his superior are proper considerations in determining the questions of negligence, of assumed risk, and contributory negligence.

5. SAME—TRIAL—ARGUMENT—APPEAL AND ERROR.

An appellant, who does not satisfy the court on error that the admission of evidence and argument of counsel objected to were prejudicial, is not entitled to a reversal.

6. SAME—TRIAL—MORTALITY TABLES—EXPECTANCY.

A statement by the court, in charging the jury, that the mortality tables showed plaintiff's expectancy to be forty years, is not open to the objection that the jury were not permitted to consider plaintiff's life at less than forty years, in the absence of requested instructions on the point or the direction of the court's attention thereto on the trial.

7. SAME—WORDS AND PHRASES.

"Expectancy of life" accurately expresses the time which a healthy person may expect to live, as shown by mortality tables.

Error to Charlevoix; Mayne, J. Submitted January 21, 1910. (Docket No. 108.) Decided April 1, 1910.

Case by Frederick Belmer, by next friend, against the Boyne City Tanning Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Knowles & Converse* and *John M. Harris*, for appellant.

*H. A. Jersey* and *George E. & M. A. Nichols*, for appellee.

OSTRANDER, J. In substance, the case stated in the

declaration of the plaintiff is that, having been employed at labor not dangerous to life or limb, plaintiff was ordered from his regular employment to employment more dangerous and really hazardous, by one who had, as to him, the authority of the master; that plaintiff was immature, was advised by said superior that what might have been considered as an obvious danger was not a danger, and that he was injured in the said employment while following the directions of his superior, and was himself without fault. The trial of the case resulted in a verdict and judgment for the plaintiff. Defendant was refused a new trial.

Four propositions are discussed by counsel for the appellant, to which form they have reduced the errors relied upon. They are:

"(1) The court erred in not directing a verdict for defendant.

"(2) The court erred in allowing certain testimony on behalf of the plaintiff to be introduced.

"(3) The argument of counsel for the plaintiff was such as to mislead and prejudice the jury.

"(4) The court erred in his charge to the jury as to the amount of damages to award plaintiff."

It is convenient to consider them in the order stated.

1. It is said that a verdict for defendant should have been directed because:

"(a) The defendant was not guilty of any negligence.

"(b) The plaintiff was guilty of contributory negligence.

"(c) The injury was caused by an unavoidable accident.

"(d) The results complained of could not have been caused by the injury complained of.

"(e) That if the injury complained of was caused by the act of Mills, Mills was a fellow-servant and the defendant company is not liable."

The testimony for the plaintiff tended to prove that the plaintiff, a lad not 16 years old, was employed to operate an extract wheel used in the process of tanning hides and

to load and unload the wheel. The wheel was some 8 feet in diameter, 10 feet in length, and hollow. In it hides were placed, and certain materials, and the wheel was revolved. Power was supplied by an electric motor. At each end of the extract wheel, on its outer surface, was a series of cogs which meshed with cogs on certain pinion wheels, the shaft upon which they were being driven by a belt working upon a pulley and running to another pulley upon a line shaft. The extract wheel was loaded and unloaded through a door in its circumference. It was very heavy when loaded. It was loaded upon the occasion in question. The pulley upon the shaft upon which the pinion wheels were was 32 inches in diameter and its center was 11 feet from the floor. The line shaft pulley, secured to the shaft by set screws, sometimes worked loose. It had worked loose upon this occasion. Discovering this, plaintiff shut the motor down, called Mr. Mills and told him of the trouble. Plaintiff had never repaired or assisted in repairing the machinery. Upon other like occasions Mr. Mills had procured the machinist employed by defendant to adjust the difficulty. On this occasion he attempted to adjust it. Plaintiff, at his direction, put up the ladder and handed him the wrench. Mills tightened one or more set screws and said to plaintiff, "Climb up on the oil barrel and try and pull the wheel around a little." Plaintiff said, "If I get up there it might turn." Mills said, "No; it won't turn." Plaintiff mounted a platform at one end of the extract wheel, mounted a barrel which was on the platform, the top of which was at or above the center of the extract wheel, and climbed into the pulley and tried to turn it. Plaintiff testified:

"*Q.* Now, when you got up there on this wheel, what position did you get in?

"*A.* Why, I got my feet in the spokes, and pulled on it.

"*Q.* Which way did you pull?

"*A.* I pulled this way—on the back of it— (Shows how he pulled.)

"*Q.* What effect did that have on that back cylinder the leather was in?

"*A.* Why, it pulled the cylinder back a little.

"*Q.* Do you know whether the stick was under there at the time that you went up on the wheel?

"*A.* Yes, sir; it was.

"*Q.* Did you put it under there at the time you went up to pull it?

"*A.* Yes, sir.

"*Q.* And it hadn't been taken out?

"*A.* No, sir.

"*Q.* You got up on this wheel you say, and put your two feet in the spokes down there?

"*A.* Yes, sir.

"*Q.* Then took hold of the wheel and did what?

"*A.* Pulled on it.

"*Q.* And the last time you pulled, when you say Mr. Mills told you to yank it harder, where was Mr. Mills?

"*A.* He was on the ladder.

"*Q.* Was he in a position so he could see what you were doing when he told you that?

"*A.* Yes, sir.

"*Q.* Well, do you know whether he was looking at you?

"*A.* Yes, sir. He had to wait there till I turned it before he could tighten the set screw.

"*Q.* Then you say after you gave it this last yank, you found yourself down on the floor?

"*A.* Yes, sir. * * *

"*Q.* When you gave this last yank, what did this pulley do, so far as you know?

"*A.* Why, it turned over a couple of times, of course.

"*Q.* Turned over?

"*A.* Yes.

"*Q.* Whirled over. Like that? (Shows.)

"*A.* Yes, sir.

"*Q.* And it threw you off?

"*A.* Yes, sir."

On cross-examination.

" I was standing on the table that goes to the vat. I could not see the door. I stood at the foot of the ladder. I was right under Mills. When he told me to get up there I got up on the oil barrel. The oil barrel is the one on the platform. There was no head in it. I stood on the chimes

of the barrel. I did not lay a board across it. There was no board across this barrel. From this I went upon the framework. I did not step on the girt in the framework right opposite this barrel. I stepped on the barrel and swung up on the framework. I took hold of the big timber shown on Exhibit A. I could not reach the pulley from the top of the barrel. I could reach the belt. I did not try to move the shaft by pulling on the belt. While I was climbing up Mr. Mills was standing on the ladder.

"*Q.* When you got up there on the framework, where did you rest to pull that pulley?

"*A.* Why, I had my feet on the spokes of the pulley when I pulled it.

"*Q.* Did you stand right up in the pulley?

"*A.* Yes, sir.

"*Q.* What did you have hold of with your hands?

"*A.* I had hold of the wheel.

"*Q.* You had a hold of the pulley?

"*A.* Yes, sir. * * *

"*Q.* Do you know whether or not that stick was in there when you got up there?

"*A.* Well, I am pretty sure it was because they couldn't take it out till after we started the wheel.

"*Q.* You couldn't take it out?

"*A.* No.

"*Q.* Why not?

"*A.* Because it wouldn't come out. The wheel rested on it. The stake might be knocked out. While I was yanking on the wheel I was stooping over and pulling on the rim of the wheel towards me. It did not move the first time I yanked it. I could not budge it the second time I yanked it.

"*Q.* But when Mr. Mills told you to yank it hard, it all at once gave way?

"*A.* Yes, sir.

"*Q.* Now is that right?

"*A.* I yanked twice on it and the second time it turned quick.

"*Q.* The second time it turned quickly?

"*A.* Yes, sir.

"*Q.* And it turned the way you were pulling it?

"*A.* Yes, sir."

Mr. Mills testified that he told plaintiff to get up and pull on the pulley. He denies having said that the wheel

would not turn, denies that he saw what plaintiff did do, denies that he told him to "yank" the pulley. On cross-examination he testified:

"*Q.* Now, when you told that boy to get up there and pull on the pulley, he was to do that for the purpose of turning that other shaft that you were working on half way round, wasn't he?

"*A.* Yes, sir.

"*Q.* And to turn the other shaft half way round he was obliged to turn the pulley that he got upon also half way round?

"*A.* Yes, sir.

"*Q.* And if he did that, he was bound to move the cylinder, wasn't he?

"*A.* Yes, sir.

"*Q.* And you knew that?

"*A.* I did; yes, sir.

"*Q.* You knew that if he moved that cylinder, didn't you, and the stick fell out, that it would settle and the other wheel would turn? Didn't you know that?

"*A.* I didn't know that.

"*Q.* You didn't know that? After 17 years as foreman in the loft there and in other places?

"*A.* No, sir, I never seen those cylinders till but a short time before that—these wheels were not in operation till but a short time before that.

"*Q.* How long had you had that cylinder up there?

"*A.* About three years.

"*Q.* And in three years you hadn't learned that the hides would settle when placed in there, unless there was a stick to keep them steady? Hadn't you, witness?

"*A.* Why, if they piled the hides in the front part of the wheel and the stick came out, it would fall down, no doubt about that.

"*Q.* What was the stick put in for?

"*A.* To hold it.

"*Q.* And what would happen if the stick fell out, or got out?

"*A.* It would settle down.

"*Q.* You knew that, if that boy put force enough on that cylinder to move that shaft around, it would move the cylinder, didn't you?

"*A.* Yes, sir.

"*Q.* And you knew if he moved the cylinder that the stake or stick would fall out?

"*A.* I can't say as to that. I didn't pay any attention to where he was going. I didn't look at him. I never noticed where he was going. I told him to get up and pull that pulley. He was standing on the floor where I had the ladder. He was standing on the floor when I last seen him. I don't remember whether I told him to give me the wrench. If he did give it to me he had to either climb up the ladder or climb up and stand on the drainage table, or else get up on these steps. I said to him, 'Get up and pull on the pulley.' I couldn't say that he had ever done such a thing before that.

"*Q.* And you knew, didn't you, Mr. Mills, that if he pulled on that pulley as you directed him, and thus turned the set screw of that clutch up as you wanted him to do, that the cylinder would settle or was liable to settle, and, if it did, that it would turn the whole thing like lightning, didn't you?

"*A.* Yes. No doubt it would. While this boy was getting up somewhere to pull on that pulley I was up on the ladder at the clutch. I never took my eyes off the clutch because I was watching for him to turn that up so I would get at that set screw. I can't say as the shaft turned. I see it move, just in that way, backwards and forwards a trifle, and I told him to pull a little more. Just while you could say it, I heard the noise at the back side of the wheel, and turned round quickly, and I saw Fred Belmer at the back side of the wheel kneeling on his knees with his left hand to his eye. I was watching the set screw move a trifle back and forth.

"*Q.* You watched this set screw move a trifle back and forth?

"*A.* Yes, sir.

"*Q.* And then you said to Fred, 'Pull harder?'

"*A.* Yes, sir.

"*Q.* Well, I will ask you this question: You said to the boy, 'Pull harder,' did you, Mr. Mills?

"*A.* I told him to pull a little more. I remember telling him to pull a little more. I didn't know where the boy would go to pull on that wheel."

So much testimony has been set out to show that the injury itself may be accounted for, that the jury were warranted in finding that it was not an unavoidable accident, the risk to which plaintiff was exposed, the express direction by which he acted.

Mr. Mills was in authority in this department, hired and discharged the men, and was the one to whom they came for orders and directions. The fact that one employé has authority to hire and discharge other employés is not conclusive of his relation of fellow-servant to other employés. *Beesley* v. *Wheeler & Co.*, 103 Mich. 196 (61 N. W. 658, 27 L. R. A. 266); *Findlay* v. *Wheel Co.*, 108 Mich. 289 (66 N. W. 50); *Andre* v. *Elevator Co.*, 117 Mich. 563 (76 N. W. 86); *Wellihan* v. *Wheel Co.*, 128 Mich. 1 (87 N. W. 75); *Lepan* v. *Hall*, 128 Mich. 523 (87 N. W. 619); *Corey* v. *Iron Co.*, 151 Mich. 558 (115 N. W. 737).

If in the course of the regular employment and while being assisted therein by Mills, plaintiff had been injured through the negligent conduct of Mills, a different question would be presented. But where a servant is exposed to danger not in the line of the duties he has engaged to perform, by one whom the master has placed over him, and to whose orders he is subjected, this wrongful act of his superior may be treated as the wrongful act of the master. And it is proper to take into consideration, in a case like the one here presented, the age of the plaintiff and the tendency of a lad of his age to obey directions and to defer to the judgment of one placed in authority over him. In principle the contentions of appellant presented under this head must be resolved against it upon the authority of *Chicago, etc., R. Co.* v. *Bayfield*, 37 Mich. 205. None of them can be determined in defendant's favor as matter of law.

2. We have examined the portions of the record referred to by counsel and are not satisfied that if the rules of evidence were violated, which is doubtful, defendant was prejudiced thereby.

3. We may not correctly appreciate the bearing of the remarks of plaintiff's counsel which are complained about, but, if we do, error is not well assigned.

4. Complaint is made that in the charge to the jury the probable duration of plaintiff's life, as shown by the mortality tables, was treated as established. It does not ap-

pear that counsel for defendant preferred any request to charge upon the subject nor, after the charge was given, did they direct the attention of the court to any error therein. It was not assigned as a reason for a new trial. And after instructing the jury that every dollar given plaintiff presently would earn $2 in 40 years, and that $33.33⅓ would be the present worth of $100 in 40 years, the court said: "Gentlemen, have I laid down that rule correctly?" Evidently there was no response and the court continued:

"Well, I have given you the rule, gentlemen, and you will take that as the rule. I will look it up, and, if I find I am wrong, I will recall you. I am speaking of it as I recall it."

The use which a jury may make of the tables showing the expectancy of life at any age is not different in different cases in which they are admitted in evidence. There is no reason to apprehend that trial judges, in this State, entertain different views upon the subject or that it is ever intended to enlarge or to restrict the force and, effect which should be given to them, as evidence under repeated decisions of this court. If a misstatement of the law is made, it must be assumed that it is an inadvertence. In a given case, what is said upon the subject to the jury may be patent error, likely to prejudice one or the other of the parties litigant. But, as there can rarely if ever be a difference of opinion about what ought to be said, counsel may usually have the needed correction made at once. It is contended here that the jury were not permitted to consider the probable life of the plaintiff as more or less than 40 years. What the court said was:

"Now, under the mortality tables, 40 years is the expectancy of plaintiff's life; it is a little more, but you may consider it as 40 years, because, under the instructions which I will further give you, it will be easier for you to remember and make the computations, which I will instruct you how to make."

Again it was said, after explaining that plaintiff was not entitled to his earnings until he was 21 years of age:

"His expectancy from the time he is 21 is 40 years, in round numbers."

The court correctly stated the fact from evidence furnished by the tables and from the testimony of plaintiff's health and condition prior to the accident. There was direct and positive testimony that plaintiff was a strong, healthy boy. There was no testimony contradicting it. There was therefore no evidence of the probable duration of his life except the tables of mortality. The term *expectancy of life* was technically accurate to express that which the tables of mortality showed. *Nelson* v. *Railway Co.*, 104 Mich. 587 (62 N. W. 993); *Davis* v. *Railroad Co.*, 147 Mich. 479 (111 N. W. 76). In the absence of any request from counsel that the jury be instructed that the tables were not conclusive evidence of the duration of plaintiff's life, and a refusal to so instruct, reversible error is not made out.

The judgment is affirmed.

MONTGOMERY, C. J., and HOOKER, MOORE, and STONE, JJ., concurred.