[No. 10024.   Department Two.   March 26, 1912.]

DEWITT CLINTON RICHARDSON, *Respondent*, v. THE CITY OF
SPOKANE, *Appellant*.[1]

TRIAL—VERDICT—SPECIAL VERDICT.   An answer to a special in-
terrogatory does not require a directed verdict where it did not
present the actual issue in the case.

MASTER AND SERVANT—SAFE PLACE TO WORK—NEGLIGENCE OF MAS-
TER—PROXIMATE CAUSE—EVIDENCE—SUFFICIENCY.   Where a concrete
man was sent to work in a pocket formed by the wooden forms for
a pier and arch, and a peavey used by carpenters' helpers upon the
arch was dropped upon him, crushing his skull, whether the master
was guilty of negligence in failing to furnish a safe place to work,
and if so, whether the same was the proximate cause of the injury,
are questions for the jury, where there was evidence from which
the jury might have found that his place for work was at the bot-
tom of a small enclosed pocket 25 feet deep, that the wooden wall
for the arch formed an incline on which anything dropped would
slide down into the pocket, making the place exceedingly danger-
ous while men were working on the arch above, that a screen or
barrier could have been easily placed to catch falling objects, but
none was provided, that no men were at work on the arch when
the plaintiff was sent into the pocket, and no warning given that
men would be placed there, and that the men sent to work on the
arch out of plaintiff's sight and hearing were using heavy tools and
handling timbers, and the master gave the plaintiff no notice of the
changed conditions increasing the dangers of the place.

SAME—FELLOW SERVANTS—CONCURRING NEGLIGENCE.   In such a
case, there is no question of the negligence of a fellow servant in-
volved, especially where there was evidence that the peavey did not
fall through the negligence of the carpenter's helper, but through
the vibration caused by the work on the arch; concurring negligence
of a fellow servant being no defense.

DAMAGES—PERSONAL INJURIES — INSTRUCTIONS — EXPECTANCY OF
LIFE.   It is not error to instruct the jury on the measure of damages
for personal injuries, to consider the plaintiff's "expectancy of life,"
following immediately a reference to his previous condition of
health and earning capacity, and followed immediately by reference
to the permanency of the injury, where recovery for future pain
and suffering was limited to that resulting from the injury.

DAMAGES — PERSONAL INJURIES—MORTALITY TABLES—EVIDENCE—
ADMISSIBILITY.   In an action for permanent personal injuries, mor-

[1]Reported in 122 Pac. 330.

tality tables are admissible in evidence in connection with the plain-
tiff's prior state of health, and the probable permanency of his in-
juries in determining loss of earning capacity.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for
$15,000 for injuries sustained by a man 26 years of age, in good
health, is not excessive, where he suffered partial paralysis, has
undergone two surgical operations, part of his skull was removed,
he has been months in a hospital, expending $2,000 in hospital and
doctor's bills, and his injuries are permanent.

Appeal from a judgment of the superior court for Spo-
kane county, Huneke, J., entered June 17, 1911, upon the
verdict of a jury rendered in favor of the plaintiff, in an
action for personal injuries sustained by an employee in the
construction of a concrete bridge. Affirmed.

*Cannon, Ferris, Swan & Lally,* and *A. M. Craven,* for
appellant.

*Nuzum & Nuzum* and *Geo. H. Armitage,* for respondent.

ELLIS, J.—This is an action to recover damages for per-
sonal injuries, suffered by the plaintiff while in the employ
of the city of Spokane, in the construction of a concrete
bridge across the Spokane river at Monroe street in that
city. Many men were employed in the work. The carpen-
ters and carpenters' helpers, who were constructing the
wooden forms for the piers and arches of the bridge, were
under one foreman. The men who mixed, poured, spread, and
tamped the concrete into the forms when completed were
known as concrete men, and were divided into several gangs
according to their places of work. Each concrete gang was
under a subforeman, and all under a head concrete foreman.
The whole work was under the direction of a superintendent.
The plaintiff was employed as one of the concrete men. While
at work in a hole or pocket formed by parts of the wooden
forms for a pier and an arch, into which place he had been
ordered by his immediate foreman, a peavey, used by one of
the carpenters' helpers at work upon the arch, fell upon him,
crushing his skull. The negligence charged was failure to

use reasonable care to provide and maintain a safe place of work for the plaintiff, and failure to warn him that men would be set to work upon the arch or span above him, thus rendering his place of work dangerous. At appropriate times, the defendant interposed motions for a nonsuit, for a directed verdict, and for judgment notwithstanding the verdict. These were overruled, and a judgment was entered upon the verdict of the jury for $15,000 and costs. The defendant has appealed.

The appellant's first contention is that the trial court erred in denying the motions for a nonsuit, for a directed verdict, and for judgment notwithstanding the verdict. The argument in support of this contention is directed to an answer to the inquiry, Is a master required to anticipate the negligence of his servant and the result of that negligence to a fellow servant? Of course, the answer to the question thus broadly put would usually be in the negative. But the question does not present the actual issue on the facts before us. The real issue is better presented by the following questions: Was the master guilty of negligence in failing to use reasonable care to provide a reasonably safe place for the servant's work, and in failing to maintain it in a reasonably safe condition? If it was, then was the injury the result of that failure as the proximate cause?

That it is the positive duty of the master to exercise reasonable care to furnish a safe place of work, and that the duty is a continuing one, has so often been stated by this and other courts as to require no citation of authority. The divergence of the adjudicated cases is found, not in any real difference of opinion as to the nature or scope of the rule, but in determining what in a given case is reasonable care. That is necessarily a relative question to be determined by the nature of the work, the imminence of the danger, the consequences to be anticipated, and all the conditions, circumstances, and surroundings. These are matters resting in evidence. This, like every other question of negligence, whether

primary or contributory, is a question for the jury, whenever under the evidence the court cannot say that the minds of reasonable men may not honestly differ thereon. *Richmond v. Tacoma R. & Power Co., ante* p. 444, 122 Pac. 351. It is not our duty to weigh the evidence, nor to pass upon its credibility. We can do neither without invading the province of the jury. We may only take the facts most favorable to the respondent, as developed by the evidence, apply the law thereto, and determine whether such facts are sufficient in law to sustain the verdict.

There was evidence from which the jury might have found the following facts: That the respondent was, at about eight o'clock in the morning, ordered by his immediate superior, the city subforeman of the particular concrete gang in which respondent was employed, to go with another man to the bottom of a hole or pocket, about twenty-five feet deep, between five and six feet long, and about two feet wide, inclosed by the wooden walls of the forms for a concrete pier and arch, and there clear out concrete which had fallen into certain drains at the base of the pier and arch; that after rising from the bottom of the hole some few feet, the wooden wall on one side passed out in a wide curve, making a part of the form for a proposed concrete arch, and forming a curving wooden incline leading directly into the pocket; that any tool or other object dropped or escaping from men at work upon this incline, whether by unavoidable accident or otherwise, would inevitably slide down it directly into and fall to the bottom of the pocket; that in the absence of a screen or barrier across the incline near where it approximated the perpendicular and formed the pocket, the bottom of the pocket, though reasonably safe at other times, was an exceedingly dangerous place in which to work while men were at work upon the arch above; that such a barrier could easily have been placed so as to avoid all danger from falling objects to those working in the pocket; that no such barrier was provided, and no one was ordered to place any protection

over the pocket; that all of these things were patent and obvious to any one.

There was also evidence from which the jury might have found that there were no men at work upon the span or arch when the respondent and the man with him were sent into the pocket, and that they received no warning that men would be placed at work upon the arch while they were there; that the respondent at the time of the injury was loosening with a pick concrete which had fallen into the drains in the bottom of the pocket, while the other man with him was shoveling the debris into a bucket lowered from the top by a third man who would draw the bucket up with a rope; that the noise made by these two men working in this confined resonant space was such as to prevent them from hearing the men at work upon the arch above and some fifty or sixty feet distant; that the hole was so deep that they could not see the men on the arch, and that they had no knowledge that men were at work there or would be while the respondent and his companion were in the pocket. The appellant introduced evidence contradicting all or nearly all of these things, but it was for the jury to say what evidence was most credible and convincing, and which witnesses were to be believed. There was no conflict in the evidence that, about 11:30 o'clock in the forenoon of the day in question, while the defendant was on his knees loosening the concrete in the drains with a pick, a peavey escaped from one of the carpenters' helpers at work in placing forms upon the arch, slipped down the incline of the arch, fell into the pocket and, striking the respondent upon the left side of the top of the head, inflicted the injuries complained of; that the men upon the arch were using heavy tools such as peavies, adzes, hammers, iron mallets, and saws, and handling timbers.

Upon all of these facts, of which there was ample evidence which the jury might believe, we cannot say, as a matter of law, that the jury could not find the master negligent. Taking these things as true, the place of work was safe when

the respondent went to work. Conditions were changed so as to make the place extremely dangerous, by the master sending carpenters to work upon the arch. It was the master's duty to warn the respondent of the danger thus created, and take reasonable precautions for his protection, or give him a chance to protect himself. The appellant, or those placed in charge of the work by the appellant, did nothing. It failed as master to perform its whole duty to the servant. In the following cases these principles have been fully exemplified and soundly applied. They seem to us controlling upon the facts here presented: *Pennsylvania Steel Co. v. Jacobsen,* 157 Fed. 656; *Northwestern Fuel Co. v. Danielson,* 57 Fed. 915; *Mullin v. Northern Pac. R. Co.,* 38 Wash. 550, 80 Pac. 814; *Howland v. Standard Milling & Logging Co.,* 50 Wash. 34, 96 Pac. 686; *McLeod v. Chicago, Milwaukee & St. P. R. Co.,* 65 Wash. 62, 117 Pac. 749.

It may well be doubted whether there was any such consociation of employment between the respondent and the carpenters as to make them fellow servants within any just application of that doctrine. There was no opportunity for that mutual observation and protection which is the logical basis of the rule. 2 Labatt, Master and Servant, § 501a.

We fail to find, however, that there is any question of fellow servant properly involved in this case. The carpenters' helper, whose peavey it was that escaped, testified that, while not using it, he stuck it between the lagging or strips in the floor of the arch; that in some way unknown to him, but he thought by reason of the vibration of the arch caused by the work being done upon it, the peavey became disengaged and slipped down the incline. His testimony tended to show that the escape of this particular tool was an unavoidable accident. The evidence was far from establishing any positive negligence on the part of this man or any other of the carpenters. However that may be, it is plain that the placing the man to work upon the arch would inevitably make respondent's place of work dangerous, though the men upon

the arch employed the utmost care. The danger from such an escape, whatever the occasion, was so obvious, the disastrous result to the men in the pocket so inevitable and manifest, the protection against it so palpably necessary and easy to provide, that the jury were justified in finding that the failure to provide such protection or to warn of the new danger was the proximate cause of the injury. It was the cause without which the injury could not have occurred, and by which the respondent's place of work was rendered unnecessarily and inevitably dangerous when men were placed to work upon the arch. If there was any concurring negligence of a fellow servant, it would not relieve the master from liability for a failure to observe its positive duty to the respondent.

"We have frequently stated and approved the principle that the duty of the master to provide a reasonably safe place and reasonably safe appliances for his servant is personal, and, whether this duty is performed by the principal or by his agent, whoever that agent may be and in whatever capacity he may generally be employed, the duty is still that of the principal. It is also well settled that, if the negligence of a fellow servant concur with the negligence of the master, it does not excuse the primary negligence of the master for injury to another fellow servant." *Ralph v. American Bridge Co.*, 30 Wash. 500, 70 Pac. 1098.

See, also, *Howe v. Northern Pac. R. Co.*, 30 Wash. 569, 70 Pac. 1100, 60 L. R. A. 949; *Czarecki v. Seattle & S. F. R. & Nav. Co.*, 30 Wash. 288, 70 Pac. 750; *Costa v. Pacific Coast Co.*, 26 Wash. 138, 66 Pac. 398; *Grand Trunk R. Co. v. Cummings*, 106 U. S. 700. The motions were properly overruled.

It is next contended that the court erred in instructing the jury as follows:

"If you find a verdict for the plaintiff you will allow him such sum as will fairly compensate him for the injury he has sustained, and to determine its amount, you may consider plaintiff's age, his previous condition of health, his earning capacity, his expectancy of life, the permanency of the in-

jury, the pain and suffering he has endured, and which he will probably suffer from the injury in the future, and the expense he has incurred for physicians and hospital services on account of such injury."

The appellant had objected to the admission of the mortality tables in evidence, on the ground that they were made for well men, and did not form a basis of proof of expectancy in view of the plaintiff's injured condition. It is argued that this instruction was wrong, in that it permitted the jury to consider the life expectancy of the respondent as a well man, and not in his then injured condition, in determining his damages for future pain and suffering. There would be merit in this contention had the claim for damages been based upon present and future pain and suffering alone; but such was not the case. The claim was for loss of earning capacity as well as for pain and suffering. The phrase "his expectancy of life" in the instruction, following immediately the reference to his previous condition of health and his earning capacity, and followed immediately by the reference to permanency of injury, was obviously intended to be considered with reference to those things. The reference to the pain and suffering which he had endured and probably would endure in the future was in plain terms limited to that resulting "from the injury," and was just as obviously intended to be considered with reference to his injured condition and the nature and extent of the injuries, whether permanent or otherwise, and not with reference to his prior state of health or his life expectancy based thereon. If we indulge the degree of criticism invited by the appellant, we might with equal reason say that the reference to permanent injury precluded recovery for future suffering in case the injury was not permanent. Neither of these strained constructions is warranted. It will be assumed that the jurors were men of ordinary intelligence. As such they could not have been misled by the language used into a belief that respondent's future pain and suffering, plainly referred to as a result of the injured condition

alone, had any reference to his prior state of health or to his life expectancy based thereon. That the mortality tables were admissible as evidence to be considered by the jury in connection with the evidence as to the respondent's prior state of health, and the probable permanency of his injury in determining damages by loss of earning capacity, is the established law in this state. *Brown v. Blaine*, 41 Wash. 287, 83 Pac. 310; *Hodd v. Tacoma*, 45 Wash. 436, 88 Pac. 842; *Duskey v. Green Lake Shingle Co.*, 51 Wash. 145, 98 Pac. 99; *Suell v. Jones*, 49 Wash. 582, 96 Pac. 4. In the last case cited, the subject is thoroughly discussed, with the following conclusion:

"But notwithstanding these differences, the practice of admitting standard mortality tables in evidence whenever it becomes necessary to estimate the value of annuities, dower, curtesy, or damages for wrongful act, has become too well established to admit of question, and the application of the rule governing their admission does not depend on race or color, time or place. Of course the tables are not binding on the jury."

See, also, *Illinois Cent. R. Co. v. Houchins*, 121 Ky. 526, 89 S. W. 530, 123 Am. St. 205, 1 L. R. A. (N. S.) 375; *Northern Texas Const. Co. v. Crawford*, 39 Tex. Civ. App. 56, 87 S. W. 223; *Haynes v. Waterville & O. St. R. Co.*, 101 Me. 335, 64 Atl. 614; *Belmer v. Boyne City Tanning Co.*, 160 Mich. 669, 125 N. W. 726; *Louisville, N. A. & C. R. Co. v. Miller*, 141 Ind. 533, 37 N. E. 343; *Shover v. Myrick*, 4 Ind. App. 7, 30 N. E. 207; 13 Cyc. p. 198; 7 Ency. Evidence, pp. 425, 426; 8 Ency. Evidence, p. 634. We find no error in the admission of the mortality tables, nor in the instruction as given by the court.

Finally, it is claimed that the verdict is excessive. The respondent was, at the time of the injury, a young man about twenty-six years of age, in good health, and capable of earning three dollars a day, with a life expectancy of about thirty-eight years. The injury has incapacitated him for work of any kind. His right arm and right leg are partially para-

lyzed, his power of speech is impaired, there is a partial paralysis of the right side of his face, and there is a space of about two and one-half inches in diameter in the top of his head from which the skull has been entirely removed. He has undergone two surgical operations, and has spent months in a hospital. His hospital bills and doctor's bills up to the time of the trial amounted to nearly $2,000. There can be no question that his injuries are permanent. While the verdict is for a large sum, we cannot say, in view of the respondent's pitiable condition, that it is more than compensatory. It is not such as to indicate that the jury was influenced by passion, prejudice, or other improper motive. The trial court, who heard the evidence and observed the man's condition, did not reduce the verdict, and we do not feel warranted in doing so.

The cause was submitted to the jury on competent evidence and under proper instructions. We find no error which would justify a reversal. The judgment is affirmed.

DUNBAR, C. J., MOUNT, FULLERTON, and MORRIS, JJ., concur.