[No. 24122.   Department Two.   November 29, 1932.]

EUGENE LAYTON *et al., Respondents,* v. THE CITY OF YAKIMA, *Appellant.*[1]

*V. O. Nichoson* and *I. J. Bounds,* for appellant.
*Floyd Foster* and *D. V. Morthland,* for respondents.

HERMAN, J.—Plaintiffs, Eugene Layton and Leslie Layton, each brought suit against the defendant for injuries sustained by them because of the alleged negligence of the city of Yakima in the conduct of construction work being done by that city upon the waterworks

[1]Reported in 16 P. (2d) 449.

system which it owned and operated. The causes were consolidated for trial, and resulted in verdicts for each of the plaintiffs. Judgment was entered against the defendant, and defendant appeals therefrom.

Appellant makes a number of assignments of error, which raise two principal questions. The first of these is: Was the city guilty of negligence?

For about six weeks prior to the time that respondents received their injuries, the appellant was improving its water system by laying new pipes along Yakima avenue, a highway running east and west in the city of Yakima and intersected at right angles by other streets. Traffic was permitted while the construction was under way. At each street intersection along the portion of Yakima avenue under construction were placed signs, the purpose of which was to caution drivers to proceed slowly and carefully. Respondents conceded the efficacy of such signs in the daylight for the purpose for which they were erected, but introduced evidence tending to show that they did not serve their purpose at night, because of the position of flares which were set upon the pile of gravel removed from the ditch. Respondents' injuries were sustained about twelve-thirty a. m., on the night of July 15-16, 1931.

On Yakima avenue were two sets of street car tracks, one to the south of the center of that thoroughfare and the other to the north, which will hereafter be referred to as the south track and the north track. The signs at the street intersections cautioning traffic to move slowly and carefully were placed at each end of the large mound of gravel which extended along the block, covering and rising above the south track four or five feet, and extending to within about two feet of the south rail of the north track.

This pile of gravel was called to the notice of the public at night by flares lighted and placed on the north

side thereof, about one foot above its edge. These flares were from forty to sixty feet apart. While the construction was under way, traffic was permitted to travel along the north track immediately north of the line of flares. The large trench from which the gravel had been excavated was south of the south track. This condition with reference to Yakima avenue had existed for approximately six weeks prior to the time respondents received their injuries.

That night, appellant's employees were filling the large trench, and, to aid them in so doing, were using a piece of machinery known as a backfilling machine. This device consisted of a Ford truck, upon the bed of which was a superstructure consisting of winches, drums and a combination of related parts that extended approximately five feet above the bed of the truck. Attached to the center of the bed of the truck, and part of this contrivance, was a boom eighteen feet long and six inches in diameter. Four iron cables above and one below the boom extended to a sheave on the outer end thereof, and by means of these a scraper was operated. The body of the truck and the housing of the sheave at the end of the boom were each painted a color calculated to attract attention and called "traffic yellow." The boom was painted with a less conspicuous color. This device had an over-all length of thirty-six feet. The street was sixty-eight feet from curb to curb.

The method of operating the backfilling machine was to first get the truck into position, with its front wheels against the north curb, and adjust the scraper attached to the boom, before the portion of the pile of gravel that was to be pushed and scraped into the trench south of the car tracks. This process of getting the backfilling machine into position for operation was referred to by the witnesses, and will hereinafter be

referred to, as "making a set." Each "set" permitted the device to push a strip of gravel about six feet wide into the trench, after which it became necessary to again "make a set." A number of men were employed working in and upon the backfilling machine, at the time the respondents were injured.

The only lights maintained on any part of the contrivance were the headlights of the truck, which were pointed north toward the sidewalk that bordered the street. When the machine was at work filling the trench, a red lantern was kept on the pavement near the right front wheel of the truck. When the machine was moved to "make a set," this red lantern was moved by a member of the crew and placed near the right front wheel.

According to respondents' testimony, at the time of the collision appellant's crew were just finishing "making a set." The hoist operator was in the truck, the front end of which was almost at the north curb. The member of the crew carrying the red lantern was close to the north curb with the lantern, which he was swinging parallel to the curb. The lane of travel along the north track was wholly unguarded. There were no lights on the eighteen-foot boom, which protruded from the truck across the track. The truck was unlighted, save for its headlights, which were extending their light across the sidewalk at right angles to the line of traffic. There was no watchman, nor were there lights or protection of any kind guarding the line of travel in the block between Third and Fourth avenues, where the collision occurred.

The street was illuminated by the lights that constitute part of a modern street lighting system. A more detailed reference to such lights will be made in that portion of this opinion which deals with the question

as to whether respondents were guilty of contributory negligence.

Respondents' evidence indicated that they proceeded along the north track, following the lane of travel, in an automobile driven by respondent Leslie Layton, at the rate of about twenty miles per hour. While proceeding along their course, the hood of the automobile passed under the boom, which, coming in contact with the upper portion of the body of the car, crushed that and severely injured respondents.

In view of the circumstances disclosed by the evidence in the case at bar, the trial court properly submitted to the jury the question of whether appellant was guilty of negligence in its manner of conducting the work on the street.

The second question raised by appellant is: Were respondents guilty of contributory negligence, as a matter of law?

The operation of the backfilling machine was being conducted in an area that was illuminated by a modern electric lighting system. There were two lights of four hundred candle power each on both sides of the street. At the time respondent collided with the boom, the closest of these lights was approximately sixty feet from the nearest point of the backfilling machine, and nineteen feet above the pavement. There was evidence introduced showing that at night, a newspaper, printed in ordinary type, could be read on the sidewalk sixty feet from one of these lights. There was testimony which showed that an experiment had been subsequently conducted with the backfilling machine at night, under conditions similar to those prevailing at the time of the collision complained of, and witnesses testified that the boom and backfiller were visible from one hundred fifty to four hundred feet away.

The testimony of respondents is that they did not see the boom until they collided with it. The testimony of respondent Leslie Layton, who was driving, is as follows:

"Q. Were there any cars or trucks ahead of you in your line of light when you were going up Yakima avenue? A. No sir. . . . Q. State whether or not you were paying attention to anything in the street in front of your line of travel. A. Yes, I was watching everything that might come in my line of view, as any-one does when they are driving and watching for anything that might be in the way. And I was paying attention to the construction there that was taking place, and watching those ditches; and I noticed the cars parked to the curb, and everything that I could pay any attention to. . . . Q. In response to a question by counsel, you testified it was difficult for you to see objects directly in front of you and five feet or more above the street. Just what did you mean by that? A. By ordinary lights you can see anything like a car or truck or any object of any size at a normal given distance very plainly, because your lights reflect against it and throw them up. But something up higher; for instance that boom that I ran into, stand-ing out over there and up as high as my head; my lights were—the direct beam of the lights would shine under that and not against it, and the shadows thrown by the street lamps and those bombs instead of light-ing up the street, they seemed to make a shadow, and it wouldn't light it up so that it could be seen. Your own lights would go underneath after you got within 100 feet or any distance of that kind to an object of that description."

3 Blashfield's Cyclopedia of Automobile Law, p. 2203, § 55, states:

"But automobilists are not bound to anticipate and search for obstructions in the streets, but only to look ahead and see what one with an ordinary vision would necessarily see. Such travelers, moving at a rate of speed within the law, and commensurate with the con-dition of the road, are necessarily required to watch

out ahead for many different things, some of which are in the roadway and others upon the sides, that may come into it, and they cannot at all times direct their attention upon one thing to the exclusion of others; and one traveling along a highway is not required to keep his eyes upon the ground, but only to make such use of his faculties as a reasonably prudent person would under the circumstances. . . . .

"The failure of a motorist, driving in the nighttime, to observe every detail of an object presented to him by his lights, is not negligence as a matter of law."

In *Teshirogi v. Belanger,* 167 Wash. 278, 9 P. (2d) 66, this court cited with approval that portion of the decision in *Romano v. Short Line Stage Co.,* 142 Wash. 419, 253 Pac. 657, wherein the court announced:

"The rule, however, which this court has uniformly adopted is that an action for personal injuries should not be taken from the jury on the ground of plaintiff's contributory negligence, unless the same so clearly appears that reasonable minds cannot differ as to the usual and probable results of the acts proved. *Fobes Supply Co. v. Kendrick,* 88 Wash. 284, 152 Pac. 1028; *Brandt v. Northern Pacific R. Co.,* 105 Wash. 138, 177 Pac. 806, 181 Pac. 682; *Hillerbrant v. Manz,* 71 Wash. 250, 128 Pac. 892."

The trial court properly submitted to the jury the question whether respondents were guilty of negligence which contributed in a material degree to their injury. The evidence is not inconsistent with verdicts in respondents' favor.

There remains one question raised by the assignments of error, which requires our attention. Did the trial court err when he permitted exhibit "N" to be introduced in evidence?

Exhibit "N" is a pamphlet issued by the insurance department of the state of Washington, containing life expectancy tables, together with tables presenting information relative to the present value of annuities

for life. This exhibit was introduced in the case of respondent Leslie Layton. There was an abundance of evidence showing that Leslie Layton's disability was constant, and that his earning capacity was permanently impaired. In *Richardson v. Spokane*, 67 Wash. 621, 122 Pac. 330, the court said:

"That the mortality tables were admissible as evidence to be considered by the jury in connection with the evidence as to the respondent's prior state of health, and the probable permanency of his injury in determining damages by loss of earning capacity, is the established law in this state. *Brown v. Blaine*, 41 Wash. 287, 83 Pac. 310; *Hodd v. Tacoma*, 45 Wash. 436, 88 Pac. 842; *Duskey v. Green Lake Shingle Co.*, 51 Wash. 145, 98 Pac. 99; *Suell v. Jones*, 49 Wash. 582, 96 Pac. 4. In the last case cited, the subject is thoroughly discussed, with the following conclusion:

" 'But notwithstanding these differences, the practice of admitting standard mortality tables in evidence whenever it becomes necessary to estimate the value of annuities, dower, curtesy, or damages for wrongful act, has become too well established to admit of question, and the application of the rule governing their admission does not depend on race or color, time or place. Of course the tables are not binding on the jury.'

"See, also, *Illinois Cent. R. Co. v. Houchins*, 121 Ky. 526, 89 S. W. 530, 123 Am. St. 205, 1 L. R. A. (N. S.) 375; *Northern Texas Const. Co. v. Crawford*, 39 Tex. Civ. App. 56, 87 S. W. 223; *Haynes v. Waterville & O. St. R. Co.*, 101 Me. 335, 64 Atl. 614; *Belmer v. Boyne City Tanning Co.*, 160 Mich. 669, 125 N. W. 726; *Louisville, N. A. & C. R. Co. v. Miller*, 141 Ind. 533, 37 N. E. 343; *Shover v. Myrick*, 4 Ind. App. 7, 30 N. E. 207; 13 Cyc. p. 198; 7 Ency. Evidence, pp. 425, 426; 8 Ency. Evidence, p. 634. We find no error in the admission of the mortality tables, nor in the instruction as given by the court."

After collating cases from other states, in the course of its opinion in *Borland v. Pacific Meat & Packing Co.*, 153 Wash. 14, 279 Pac. 94, the court said:

"As opposed to the authorities upon which the appellant relies, the general rule seems to be to class annuity tables with mortality tables and make them admissible under the same rules and limitations. *Reynolds v. Narragansett Electric Lighting Co.*, 26 R. I. 457, 59 Atl. 393; *Baltimore & Ohio R. Co. v. Henthorne,* 73 Fed. 634; *Colusa Parrot Mining & Smelting Co. v. Monahan,* 162 Fed. 276; *Bourke v. Butte Electric & Power Co.*, 33 Mont. 267, 83 Pac. 470; *Gilman v. Dart Hardware Co.*, 42 Mont. 96, 111 Pac. 550; *Secord v. Schroeder Lumber Co.*, 160 Wis. 1, 150 N. W. 971; *Vicksburg & M. R. Co. v. Putnam,* 118 U. S. 545.

"It would seem that the cases from which we have quoted furnish ample material for qualifying instructions cautioning the jury against improper use of such tables, but as against the weight of authority we do not feel justified in holding such tables to be inadmissible."

The trial court was correct in admitting in evidence exhibit "N."

Judgment affirmed.

TOLMAN, C. J., STEINERT, MAIN, and BEALS, JJ., concur.