[No. 9012–4–III.    Division Three.    February 15, 1990.]

CARLOS C. CORNEJO, *Individually and as Personal Representative, Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*

*James S. Rogers, Andrea Darvas, Rogers & Darvas, Walter Dauber,* and *Dauber & Bartheld,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *John J. Kirschner, Assistant,* for respondent.

THOMPSON, J.—Carlos C. Cornejo, individually and as personal representative of the estate of his late wife, Elisa

(Alice) Cornejo, appeals a judgment entered on a jury verdict finding Mrs. Cornejo 90 percent negligent in her own death. Mr. Cornejo contends the jury was instructed improperly and the court erroneously permitted testimony on annuities as a way of replacing future economic losses. We affirm the damage award, but reverse and remand for a new trial on the issue of the parties' comparative liability.

Mrs. Cornejo fell to her death from the Ahtanum Creek Bridge. The bridge, an overpass structure[1] on Highway 97 just south of Union Gap, Washington, actually consists of two parallel spans, one for the two northbound lanes and another for the single southbound lane. On the left and right sides of each span are 31–inch–high concrete "New Jersey" barriers. An open gap of approximately 5 feet separates the parallel bridges. At the point where Mrs. Cornejo died, the bridges are approximately 40 feet above the ground.

Mrs. Cornejo was returning home from work on January 19, 1985, driving north on Highway 97. Ahead of her was a car driven by Loretta Rhinevault. At approximately 5:30 p.m., as their cars entered onto the bridge, it was dark, and freezing rain had begun to fall. A "solid sheet of ice" covered the road. Ms. Rhinevault's car spun around and came to rest on the right side of the road, facing the oncoming traffic. Mrs. Cornejo's car also spun out and came to a stop about 20 feet from the Rhinevault car, roughly perpendicular to the direction of traffic, facing the median barrier and across portions of both northbound lanes.

Both drivers got out of their cars and spoke briefly. Ms. Rhinevault saw headlights from other vehicles approaching from the south. Both drivers turned away, and Ms. Rhinevault assumed Mrs. Cornejo was returning to her car. No one saw Mrs. Cornejo alive again.

---

[1]The bridge spans Ahtanum Creek, a 2–lane road, and two sets of railroad tracks. It also accommodates approach ramps for the intersection of Highway 97 and Interstate 82. Work on the 3–year project was completed in 1982.

A third car, driven by Ernesto Gonzalez, then collided with Mrs. Cornejo's car. A semi truck, driven by Lawrence Trapp, jackknifed across both northbound lanes some distance to the south.

State Patrol officers found Mrs. Cornejo's body under the bridges several hours later. The investigating officer concluded Mrs. Cornejo was not struck by a vehicle, and formulated three possible explanations for her death: (1) she attempted to jump to the other bridge to avoid the oncoming traffic; (2) she straddled the barrier, lost control and fell; or (3) she jumped over the barrier, believing the area between the bridges was covered. A plaintiff's expert testified at trial, based on the location of the body under the bridges, that Mrs. Cornejo simply vaulted over the barrier, "with no premonition that there was a hazard [t]here . . .".

At trial, Mr. Cornejo presented substantial evidence of the State's negligence, which is summarized briefly here:

1. Several witnesses testified they had come close to falling through the opening between the bridges, assuming, as Mrs. Cornejo apparently did, that the space between the barriers was part of a continuous bridge deck. Truck driver Trapp, on the evening of Mrs. Cornejo's accident, avoided a similar fall when he saw a light below. A Union Gap police officer and several fire fighters, all of whom were familiar with the bridge, almost fell through the gap in the course of their duties on other occasions.

2. The Mayor of Union Gap, John Hodkinson, wrote a letter to the State Department of Transportation in 1982, after the incident involving the fire fighters. The Mayor asked the Department to install steel netting between the bridges. The Department's district administrator said in a reply letter that he shared the Mayor's concern, and noted a similar problem with parallel bridges in Kennewick. The administrator wrote that a screen had been placed over the gap in Kennewick "after several people had fallen through".

3. Transportation engineer Edward Martin Stevens testified there was a high potential for accidents on the bridge,

and the State had created an "extra hazardous condition" by failing to provide a means of preventing potential accident victims or rescuers from falling through the gap.

4. Lewis B. Horn, a structural engineer specializing in bridge design, testified it would have been feasible to design the bridge without the open gap, or alternatively to provide additional safety barriers or covering materials to prevent accidental falls. Mr. Horn testified the cost of installing a steel net over the gap would have been about $21,700.

A significant issue at trial was whether the gap between the bridges was visible, either by passing drivers or at nighttime by persons walking near the median barriers. The State's theory was that the opening was clearly visible to drivers, and because Mrs. Cornejo crossed the bridges regularly as she drove to and from work she should have noticed the gap. A State Patrol officer and two other witnesses testified they knew of the opening because they had seen it as they drove by. Counsel for the State also argued to the jury that Mrs. Cornejo should have seen the gap the night she fell, apparently on the basis that the truck driver, Mr. Trapp, saw a light under the bridges and thus knew the median was uncovered.

Mr. Cornejo responds by referring to evidence outlined above, indicating the gap was so deceptive that several people almost lost their lives as Mrs. Cornejo did. Several witnesses, including a former Union Gap police officer and truck driver Trapp, testified they were unaware of the open gap, even though they drove over the bridges regularly. Counsel for Mr. Cornejo argued to the jury that the light Mr. Trapp saw must have been from a car on the road below because nobody else saw it, and there were no permanent lights under the bridge.

The jury found the State's negligence proximately caused Mrs. Cornejo's death. It set damages at $343,667.47, but found 90 percent contributory negligence.[2] From the net damages of $34,366.75, the court deducted amounts received from settlements with other parties, for a total judgment against the State of $2,365.75.

JURY INSTRUCTIONS

The principal issue is whether the court erred in instructing the jury on the "duty of seeing". Instruction 8 stated:

> Every person has a duty to see what would be seen by a person exercising ordinary care.

See WPI 12.06. Mr. Cornejo contends Mrs. Cornejo had no duty to see the hazard that caused her death. He cites several cases that hold a person has no absolute responsibility to take note of her surroundings to discover an unanticipated danger. See *Blasick v. Yakima,* 45 Wn.2d 309, 313, 274 P.2d 122 (1954); *Hines v. Neuner,* 42 Wn.2d 116, 125–26, 253 P.2d 945 (1953); *Baltzelle v. Doces Sixth Ave., Inc.,* 5 Wn. App. 771, 776, 490 P.2d 1331 (1971). However, these cases do not support the contention Mrs. Cornejo had no duty to notice the danger in this case. The cases merely indicate knowledge of a dangerous condition may be imputed to a person if it was *reasonable* for her to notice it under the circumstances. *Blasick,* at 314; *Hines,* at 125–26; *Baltzelle,* at 776. The question is one for the jury. *Hines,* at

---

[2]RCW 4.22.005 provides:

"**Effect of contributory fault.** In an action based on fault seeking to recover damages for injury or death to person or harm to property, any contributory fault chargeable to the claimant diminishes proportionately the amount awarded as compensatory damages for an injury attributable to the claimant's contributory fault, but does not bar recovery. This rule applies whether or not under prior law the claimant's contributory fault constituted a defense or was disregarded under applicable legal doctrines, such as last clear chance."

127; *see Skaggs v. General Elec. Co.,* 52 Wn.2d 787, 791, 328 P.2d 871 (1958); *Blasick,* at 314; *Baltzelle,* at 776.

■■ The court's instruction in this case merely told the jury Mrs. Cornejo should be held to the standard of a person exercising ordinary care, and was a correct statement of the law. *Davis v. Bader,* 57 Wn.2d 871, 874, 360 P.2d 352 (1961); *Chase v. Continental Trading Corp.,* 5 Wn. App. 41, 43, 485 P.2d 463, *review denied,* 79 Wn.2d 1009 (1971); *Mendenhall v. Siegel,* 1 Wn. App. 263, 269, 462 P.2d 245, 40 A.L.R.3d 788 (1969), *review denied,* 77 Wn.2d 962 (1970).

Nevertheless, Mr. Cornejo contends that because Mrs. Cornejo did not have a positive duty to see the hazard, the instruction should not have been given. He relies on *Day v. Goodwin,* 3 Wn. App. 940, 478 P.2d 774 (1970), *review denied,* 79 Wn.2d 1001 (1971), in which the court found error in giving the "duty of seeing" instruction where only the defendant had a *statutory* duty to look for the hazard. *Day,* at 945. Here, neither party had such a positive duty, but Mr. Cornejo argues the instruction should not have been given because it unfairly emphasized the State's theory of the case. We agree.

> When the instructions as a whole so repetitiously cover a point of law or the application of a rule as to grossly overweigh their total effect on one side and thereby generate an extreme emphasis in favor of one party to the explicit detriment of the other party, it is, we think, error—even though each instruction considered separately might be essentially correct. Thus, if the instructions on a given point or proposition are so repetitious and overlapping as to make them emphatically favorable to one party, the other party has been deprived of a fair trial.

*Samuelson v. Freeman,* 75 Wn.2d 894, 897, 454 P.2d 406 (1969); *see Brown v. Dahl,* 41 Wn. App. 565, 579, 705 P.2d 781 (1985).

The "duty of seeing" instruction is a specific application of the general instruction that defines negligence as "the failure to exercise ordinary care". *See* WPI 10.01. For this reason, the comment to the pattern instruction notes it is "probably redundant". Comment, WPI 12.06. It is not an

abuse of discretion for a trial court to refuse to give the instruction when a party can argue its theory under the general negligence instruction. *Young v. Carter,* 38 Wn. App. 147, 149–50, 684 P.2d 784 (1984).[3]

While in some circumstances the instruction may be regarded as a harmless redundancy, here it was not. The instruction unfairly turned the jury's attention away from the clear evidence of the State's negligence, toward the question of Mrs. Cornejo's contributory negligence. In light of the weakness of evidence that the gap between the bridges was visible either to motorists or to pedestrians, the instruction emphatically favored the State's theory. Instruction 8 prejudicially overstated the State's minimal evidence to such a degree as to make it "palpably unfair". *Samuelson,* at 897. We therefore reverse and remand for a new trial on the issue of liability.

We address one other issue in this area as guidance for the court on retrial.

Mr. Cornejo contends the court should have instructed the jury on the State's duty to eliminate hazards or post warnings of inherently dangerous conditions. The trial court rejected proposed instruction 14, which stated:

When a particular highway condition is inherently danger-ous, or is of a character which would mislead a reasonably careful driver, the State has a duty to either eliminate the haz-ard or to post signs adequate to warn a driver of the existence

---

[3]In *Young,* the jury returned a verdict of no negligence by the defendant, whose van struck the plaintiff as he was riding a bicycle in a crosswalk. The trial court instructed the jury that the plaintiff had a duty "to exercise reasonable care, at all times, for his own safety and protection and to keep a reasonable lookout ahead and see all vehicles that were there to be seen", but refused to give a "duty to see" instruction applicable to the defendant. *Young,* at 148. The Court of Appeals rejected the plaintiff's arguments that the "duty to see" instruction should have been applied to the defendant, and that the instruction regarding the plaintiff's duties unfairly emphasized his own duty to see. *Young,* at 149. Although the court concluded there was no overemphasis, the case is distinguish-able on three bases: (1) in view of the jury's finding the defendant was not negli-gent, the plaintiff's contributory negligence was not an issue; (2) the "duty to see" instruction, as applied to the plaintiff, was part of a more general contributory negligence instruction; and (3) unlike this case, it apparently was undisputed that the hazard was visible to the plaintiff.

of the hazard. The State's duty may include the duty to maintain adequate protective barriers where such barriers are shown to be practical and feasible. Whether a particular highway condition is inherently dangerous or deceptive is an issue of fact for your determination.

Mr. Cornejo contends the proposed instruction would have provided the appropriate "yardstick" by which the jury could have compared the parties' fault. He argues the jury, unaware of the State's "affirmative duty" regarding the inherently dangerous conditions, gave insufficient weight to the State's breach of its duties. However, counsel for Mr. Cornejo in closing argument clearly articulated the State's affirmative duties, and the verdict indicates the jury accepted this argument.

■ Jury instructions must be reviewed in their entirety. *Brown v. Spokane Cy. Fire Protec. Dist. 1,* 100 Wn.2d 188, 194, 668 P.2d 571 (1983). Instruction 6 stated:

> The State of Washington has a duty to exercise ordinary care in the design, construction, maintenance and repair of its public roads and highways, including bridges, to construct and keep them in such condition that they are reasonably safe for ordinary travel with reasonable regard for dangers that should be anticipated.

*See* WPI 140.01. Instructions are sufficient if they permit both parties to argue their theories of the case, are not misleading, and, when read as a whole, properly inform the jury of the applicable law. *Gammon v. Clark Equip. Co.,* 104 Wn.2d 613, 617, 707 P.2d 685 (1985); *Brown,* at 194. Mr. Cornejo does not contend instruction 6 was misleading.

Instruction 6 properly sets forth the applicable law, which is that the State must exercise ordinary care to keep the highways reasonably safe for ordinary travel. *Boeing Co. v. State,* 89 Wn.2d 443, 446, 572 P.2d 8 (1978). Inherent in this duty is the "alternative duty either to eliminate a hazardous condition, or to adequately warn the traveling public of its presence". *Meabon v. State,* 1 Wn. App. 824, 827–28, 463 P.2d 789 (1970) (citing *Holmquist v. Grant Cy.,* 54 Wn.2d 376, 379, 340 P.2d 788 (1959)); *see also Provins v. Bevis,* 70 Wn.2d 131, 138, 422 P.2d 505 (1967); *Raybell v.*

*State,* 6 Wn. App. 795, 802, 496 P.2d 559, *review denied,* 81 Wn.2d 1003 (1972). However, as noted in the comment to the pattern instruction, the available ways the State may discharge its duty of ordinary care should not be singled out. Comment, WPI 140.01.

Instruction 6 permitted counsel for Mr. Cornejo to fully argue his theory of the case. Counsel repeatedly argued the gap between the bridges was hazardous, and pointed to evidence suggesting feasible alternatives for eliminating the hazard. The instructions, considered as a whole, provided an adequate framework for Mr. Cornejo to present his theory of the case.

## Annuity Testimony

We now consider assigned errors related to the jury's determination of damages. Mr. Cornejo presented testimony of an economist, who calculated the total economic loss at $618,633. On the issue of reducing future economic losses to present cash value, the economist testified, based on the historical pattern, interest earned on a judgment will be offset by future inflation. During closing argument, counsel for Mr. Cornejo asked for a verdict of $1,225,663, which included the economic losses plus $250,000 for Mr. Cornejo, $107,000 for son Tony, $116,000 for daughter Margo, and $134,000 for son Bobby.

The State's economist calculated the total economic loss at $233,207. He testified he determined the present value of future losses by considering the cost of an annuity, with annual payment increases of 5 percent to account for inflation.

Instruction 16 provided:

Damages for the estate of Alice Cornejo must be discounted to present cash value.

Damages for the loss of support, love, affection, care, services, companionship, society and consortium to Carlos Cornejo and loss of support, love, care, guidance, training, instruction and protection to each of the children are not reduced to present cash value.

"Present cash value" as used in these instructions means the sum of money needed now, which, when added to what that

sum may reasonably be expected to earn in the future, will equal the amount of the loss at the time in the future when the expenses must be paid or the benefits would have been received.

The rate of interest to be applied by you in making this determination should be that rate which in your judgment is reasonable under all the circumstances, taking into consideration the prevailing rates of interest in the area which can reasonably be expected from safe investments which a person of ordinary prudence, but without particular financial experience or skill, can make in this locality.

As an offset to the reduction of damages to present cash value, you may consider the future decrease in the purchasing power of money which may be caused by future inflation, if any.

*See* WPI 34.02. Mr. Cornejo contends the State's expert testimony regarding the cost of an annuity, addressing the question of present cash value, should have been excluded on both evidentiary and policy grounds.

■ We first address the evidentiary issues. ER 702 permits expert testimony if it will help the jury. The trial court has broad discretion in admitting expert testimony, and the decision will not be reversed if there are "fairly debatable" reasons for it. *Group Health Coop. of Puget Sound, Inc. v. Department of Rev.,* 106 Wn.2d 391, 398, 722 P.2d 787 (1986). ER 703 provides:

**BASES OF OPINION TESTIMONY BY EXPERTS**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

■ Mr. Cornejo first contends the facts on which the State's expert based his opinion are not "reasonably relied upon" by economists. He points to the comments to the rule, which require that the expert must "establish that he as well as others would act upon the information for purposes other than testifying in a lawsuit" (citing 3 J. Weinstein, *Evidence* ¶ 703[01] (1975)). The advisory committee note on the parallel Fed. R. Evid. 703 points out that the intent of the rule is to "bring the judicial practice into line

with the practice of the experts themselves when not in court." *See* 5A K. Tegland, Wash. Prac., *Evidence* § 306, at 453 (3d ed. 1989).

As a practical matter, the concept of present cash value is unique to this context, and economists rarely engage in any such analysis outside of litigation. However, the costs of annuities, obtained, as here, in price quotations from insurance companies, surely are facts that would be used generally by economists and financial planners in many contexts. Annuities commonly are used in structured settlements. *See Perez v. Pappas,* 98 Wn.2d 835, 659 P.2d 475 (1983). The pattern jury instructions contain a "Present Value Table", which is essentially an annuity table representing various interest rates. 6 Wash. Prac., *WPI* app. E, at 768–69 (3d ed. 1989). The 1986 tort reform act requires the court, at the request of a party, to order periodic payment of future damages that exceed $100,000. RCW 4.56.260. The facts on which the State's expert relied here are of the "type reasonably relied upon" by economists.

Mr. Cornejo next contends the expert's testimony invaded the province of the jury, by assuming a "built–in" interest rate. In fact, the expert testified the annuity he used in his analysis yielded 8.7 percent to 8.75 percent. The objection here seems to be that the expert's analysis contained an assumed fact which, under the instruction, was for the jury itself to decide. Under the modern rules, however, opinion testimony may embrace an ultimate issue to be decided by the jury. ER 704. The jury was instructed it was not bound by the experts' opinions, and counsel for Mr. Cornejo was free to inquire as to the appropriateness of a particular interest rate or to suggest another. *See* 5A K. Tegland § 313, at 488–93.

Next, Mr. Cornejo contends the State's expert impermissibly relied on hearsay statements of others regarding the costs of annuities.[4] The evidence rules clearly

---

[4]Mr. Cornejo relies on *United States v. Lawson,* 653 F.2d 299, 302 (7th Cir. 1981), *cert. denied,* 454 U.S. 1150, 71 L. Ed. 2d 305, 102 S. Ct. 1017 (1982), in

envision experts' reliance on hearsay, *see* ER 703, and leave to the other party "the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness . . .". 5A K. Tegland § 313, at 488 (quoting *Smith v. Ford Motor Co.,* 626 F.2d 784, 793 (10th Cir. 1980), *cert. denied,* 450 U.S. 918, 67 L. Ed. 2d 344, 101 S. Ct. 1363 (1981)). The trial court was within its discretion in permitting the State's expert testimony.

Mr. Cornejo also raises several policy–based objections to the annuity evidence.

> Since the purpose of the verdict is to restore to the plaintiff the earning capacity which the jury finds he will lose in the future, it might be logical to assume that the simplest way of establishing that loss, reduced to its present value, would be to determine the amount for which the plaintiff could purchase a single premium annuity which would guarantee the plaintiff during his life–time an income equivalent to that which he had lost because of the wrongful act. But the courts are far from being in agreement that evidence of such a cost is admissible.

J. Stein, *Damages and Recovery* § 173, at 337 (1972). Both parties have cited cases from other jurisdictions that tend to support their points of view. Other cases may be found in Annot., *Cost of Annuity as a Factor for Consideration in Fixing Damages in Personal Injury or Death Action,* 53 A.L.R.2d 1454 (1957), and supplements.

Of the cases cited by the parties, two are inapplicable.[5] The results of others may be explained, at least in part, as

----

which the court held an expert may not simply summarize the out–of–court statements of others. *Lawson* is inapplicable. It applied the constitutional right to confront adverse witnesses in a criminal case, rather than the evidentiary standard of ER 703.

[5]In *Diede v. Burlington Northern R.R.,* 772 F.2d 593 (9th Cir. 1985), the issue related to the defendant's offer to present evidence that annuity payments would be tax–free and the defendant's offer to stipulate that it would purchase an annuity at whatever rate was available. The court did not address the issue of admissibility of annuity cost evidence, and in fact such evidence was admitted at trial, without challenge on appeal. And *Merendino v. FMC Corp.,* 181 N.J. Super. 503, 438 A.2d 365 (1981), involved calculation of reasonable attorney fees after the parties had agreed on a structured settlement. The court held the proper amount on which to base the fees was the cost of annuities to provide future periodic

based on evidentiary concepts discarded by the modern evidence rules. For example, in *Caldwell v. Southern Pac. Co.*, 71 F. Supp. 955 (S.D. Cal. 1947), the court refused to permit an actuary to testify on the cost of an annuity. The decision appears to be based primarily on the failure to admit into evidence the annuity tables on which the actuary's testimony would have been based. *Caldwell,* 71 F. Supp. at 958. However, ER 703 permits such expert testimony. The court in *Scott v. James Gibbons Co.,* 192 Md. 319, 64 A.2d 117, 123 (1949) similarly noted that the annuity tables on which the proffered testimony was based were not in evidence, and that the experts' opinions would be based on an assumed rate of interest, as an issue for the jury to decide. However, ER 704 permits opinion testimony on an ultimate issue. Two cases cited by the State, on the other hand, appear to reflect the modern policies of permitting testimony helpful to the jury, and permitting opinion testimony embracing an issue to be decided by the jury. *See Texas & N.O.R.R. v. Jacks,* 306 S.W.2d 790, 796 (Tex. Civ. App. 1957) (objections go to weight, not admissibility); *Spence v. Commercial Motor Freight, Inc.,* 99 Ohio App. 143, 127 N.E.2d 427, 432, 53 A.L.R.2d 1445 (1954) (testimony assists jury in determining ultimate issue).

Mr. Cornejo relies heavily on *Herman v. Milwaukee Children's Hosp.,* 121 Wis. 2d 531, 361 N.W.2d 297 (Ct. App. 1984), *review denied,* 122 Wis. 2d 782, 367 N.W.2d 222 (1985), in which the Wisconsin Court of Appeals stated:

> Once a jury has discounted a future loss to present value, taking inflation into account, its task has been accomplished. The jury is not instructed to take into account how much can then be earned with the discounted sum. Admission of annuity evidence could have misled the jury into believing it must award a lesser sum than the present value of the future losses. Therefore, the trial court did not abuse its discretion in limiting the cross–examination of [the economist] so as to exclude testimony on the cost of an annuity.

payments, because that was the "actual present value" of the settlement. *Merendino,* 438 A.2d at 368. The decision did not address the *admissibility* of annuity cost evidence.

*Herman,* 121 Wis. 2d at 553. *See also Farmers Union Federated Coop. Shipping Ass'n v. McChesney,* 251 F.2d 441, 444 (8th Cir. 1958). The difficulty with the Wisconsin court's approach is that it assumes an annuity cost is necessarily different from the present value figure as calculated by the jury. The cost of an annuity, which carries interest at a known rate, and which, as the State's expert testified here, may provide for yearly increases to account for expected inflation, is relevant evidence of the present value of future losses. The cost of an annuity thus is not a different, lesser amount, but is evidence to be considered by the jury in determining present value.

Mr. Cornejo's objection to the evidence presented here appears to be primarily that it conflicts with the opinion of his own expert: the amount to be earned through interest is approximately offset by the reduced purchasing power of the dollar. The attractiveness of this theory is obvious, in that it avoids any need to discount future damages, a matter even the Supreme Court views as difficult. *See Perez v. Pappas, supra* at 843. In the absence of testimony or other evidence to the contrary, judicial notice of this relationship may be taken. *Mendelsohn v. Anderson,* 26 Wn. App. 933, 940, 614 P.2d 693 (1980). However, the instruction on present value and the guidelines on how to calculate it are mandatory. *Hinzman v. Palmanteer,* 81 Wn.2d 327, 335–36, 501 P.2d 1228 (1972). The matter is for the jury to decide, in consideration of all the relevant evidence submitted by the parties. A judicial application of the economic theory proposed by Mr. Cornejo thus would be inappropriate.

With this in mind, we address briefly the specific policy objections raised in this appeal. First, Mr. Cornejo contends the State's expert testimony failed to address the issues required by the jury instruction. However, the expert's analysis did propose a specific interest rate, a matter for the jury's determination. Opposing counsel was free to cross–examine the expert, or to present evidence of a

different rate. Mr. Cornejo next contends the expert's testimony deferred to the decision of an annuity provider, and the cost included such additional costs as sales commissions, profit and overhead.[6] These facts also are matters that could have been revealed to the jury on cross examination. Next, Mr. Cornejo contends an annuity forces the beneficiary of a damages award to assume the entire risk of future inflation. Any compensation system providing for present payment of future losses in some way involves the risk of inflation.[7] Also, a jury verdict based on annuity evidence does not require the recipient to purchase an annuity with the proceeds. The beneficiary is free to engage in any investment scheme available.

Finally, Mr. Cornejo contends testimony on the cost of a specific annuity is misleading to the jury. He concedes annuity *tables* are admissible in Washington. *See Layton v. Yakima,* 170 Wash. 332, 338–40, 16 P.2d 449 (1932); *Sadler v. Wagner,* 5 Wn. App. 77, 486 P.2d 330 (1971). He argues, however, that evidence of the actual cost of a specific annuity will mislead the jury into accepting the hypothetical figure used by the expert. Illinois courts subscribe to this view. *See Lorenz v. Air Ill., Inc.,* 168 Ill. App. 3d 1060, 522 N.E.2d 1352, 1356 (1988); *Singh v. Air Ill., Inc.,* 165 Ill. App. 3d 923, 520 N.E.2d 852 (1988). However, the modern evidence rules permit an expert to state an opinion without prior disclosure of the underlying facts, leaving to the opposing party the responsibility of questioning the basis of the opinion. ER 705; 5A K. Tegland § 310, at 481–82.

We find no error in permitting the annuity testimony.

---

[6]Mr. Cornejo's objection on this basis is difficult to follow. Factors tending to *increase* the cost of an annuity would result in a greater present value amount. To the extent the expert's testimony did include these amounts, Mr. Cornejo has suffered no prejudice.

[7]Mr. Cornejo also argues the applicable interest rate may change quickly after the judgment is entered. If a case is appealed, he argues, the applicable interest rate may change. RCW 4.56.110(3) provides for postjudgment interest at a rate set by statute.

### SPECIAL VERDICT FORM

Finally, Mr. Cornejo contends the court should have submitted to the jury a special verdict form that would have required the jury to itemize the damages individually for Mrs. Cornejo's estate, for Mr. Cornejo, and for each of the three children. The verdict form actually submitted permitted the jury to establish the total amount of damages generally for the estate of Mrs. Cornejo.

A child has an independent cause of action for loss of parental consortium, *Ueland v. Pengo Hydra–Pull Corp.*, 103 Wn.2d 131, 691 P.2d 190 (1984), and a spouse has an independent cause of action for loss of spousal consortium. *See Christie v. Maxwell*, 40 Wn. App. 40, 696 P.2d 1256, *review denied*, 104 Wn.2d 1002 (1985). The State contends that because the children were not named as plaintiffs in this action, they should not be included in the verdict form. However, a wrongful death action is filed for the benefit of the surviving spouse and children of the decedent. RCW 4.20.020. There was no need to name the children as plaintiffs.

In *Parrish v. Jones*, 44 Wn. App. 449, 454, 722 P.2d 878 (1986), the court held damages awarded in a wrongful death action are apportioned based on the actual losses of each beneficiary. However, Mr. Cornejo cites no authority for his argument the beneficiaries must be named separately on the verdict form.[8] Here, the jury was fully instructed that its verdict should include loss of consortium to both Mr. Cornejo and the children. *See* WPI 31.02, 31.03. Counsel for Mr. Cornejo took full advantage of this instruction in final argument. Particularly in light of the requirement that Mrs. Cornejo's contributory negligence also must reduce the spouse's and children's damages, *see* RCW 4.22.020, we see no prejudice in failing to itemize the damages.

Nevertheless, we believe the better practice in such a situation is for the jury to apportion damages at the time it

---

[8]The special verdict form is recommended in WPI 45.02.

awards them. This would avoid the type of difficulty presented in *Parrish,* which involved a dispute over the proceeds to a wrongful death settlement.

██ We affirm the jury determination of the total amount of damages. However, we reverse on the basis the jury's allocation of fault was tainted by the court's instructions. "A new trial may be limited to certain issues where it clearly appears that the original issues were distinct and justice does not require resubmission of the entire case to the jury." *Mina v. Boise Cascade Corp.,* 104 Wn.2d 696, 707, 710 P.2d 184 (1985) (citing *McCurdy v. Union Pac. R.R.,* 68 Wn.2d 457, 413 P.2d 617 (1966)).

Mr. Cornejo, noting the State has failed to cross-appeal the issue of its own liability, argues the court on retrial should direct a verdict on the State's negligence and thereby limit the jury's consideration solely to the parties' comparative fault. Generally, the court will not grant relief to a respondent who has failed to file a cross appeal. *See* RAP 2.4(a); *Wagner v. Beech Aircraft Corp.,* 37 Wn. App. 203, 213, 680 P.2d 425 (1984); *Simpson Timber Co. v. Aetna Cas. & Sur. Co.,* 19 Wn. App. 535, 542, 576 P.2d 437 (1978), *review denied,* 91 Wn.2d 1013 (1979); *Nord v. Phipps,* 18 Wn. App. 262, 266 n.3, 566 P.2d 1294 (1977), *review denied,* 89 Wn.2d 1014 (1978).

██ However, a cross appeal may not be required when a judgment was, on balance, in the respondent's favor, *Leland v. Frogge,* 71 Wn.2d 197, 202, 427 P.2d 724 (1967), or when the issues are interdependent. *Norton v. McIntosh,* 1 Wn. App. 334, 338, 461 P.2d 348 (1969); 5 Am. Jur. 2d *Appeal and Error* § 953 (1962).

Here, as in *Mina,* the judgment was essentially in the respondent's favor. Also, the issues are so interwoven that we find it necessary to remand for retrial of the *entire* issue of the parties' liability. We also have considered the potential unfairness to the State of a directed verdict. This decision carefully addresses the instructions and their impact on the jury; a directed verdict similarly may have a devastating effect on the State's defense.

We therefore remand for a new trial on the issue of the State's negligence and Mrs. Cornejo's contributory negligence, if any.

GREEN and SHIELDS, JJ., concur.

After modification, further reconsideration denied April 2, 1990.