**SOUTHLAKE LIMOUSINE AND COACH, INC., Appellant–Defendant,**

v.

**John BROCK, Administrator of the Estate of Donna J. Brock, Deceased, Appellee–Plaintiff.**

No. 45A03–9007–CV–259.

Court of Appeals of Indiana, Third District.

Sept. 16, 1991.

Jim A. O'Neal, Michael A. Wilkins, Ice, Miller, Donadio & Ryan, Indianapolis, for appellant-defendant.

Barry D. Sherman, Joseph P. Allegretti, Sherman & Allegretti, Hammond, for appellee-plaintiff.

HOFFMAN, Judge.

Southlake Limousine and Coach, Inc., appeal the jury's award of $1,500,000.00 to John Brock, administrator of the estate of Donna J. Brock, deceased.

Three issues are presented for review:
(1) whether the trial court erred in allowing the plaintiff's expert to testify regarding the value of the decedent's life;
(2) whether the trial court erred in disallowing cross-examination of the plaintiff's expert on annuities; and
(3) whether Final Instruction No. 7 was erroneous.

Donna Brock was killed in an automobile accident by a limousine owned by Southlake on January 23, 1989. Since Southlake admitted liability, a trial was held on the issue of damages only.

There was evidence admitted of the decedent's life, including her health, salary, hobbies, and household services. Experts testified as to the value of lost earnings and household services incurred by the decedent's survivors as a result of her death. None of this testimony is contested.

However, plaintiff's expert economist, Stan Smith, further testified as to the value of the decedent's life. Professor Smith explained that it was possible to place a value on intangible damages, such as the loss of care, love and affection sustained by the surviving spouse and the loss of

parental guidance and training sustained by the surviving children. To do so, Professor Smith determined the value of the decedent's life. In arriving at his conclusion that the decedent's life was worth $1.9 million, Professor Smith analyzed how much society is willing to pay to reduce the risk of people dying by accident. He looked to what society will pay for seatbelts, automobile airbags, smoke detectors, highway dividers, etc. Professor Smith analyzed what society will pay for people to take an extra risk in certain types of jobs, such as police, security personnel, employees in chemical industries, etc. His analysis was the measure of a person's "being," which did not include a measure of the person's "doing". It is a determination of the value of the life of an average person.

Professor Smith concluded that the value of an average life routinely ranges from $1.5 million to $8.5 million. He, then, subtracted out average lost earnings and household services, and determined that the value of an average life is $2.3 million. This averages out to approximately $60,-000.00 on a per year life expectancy basis. Since the decedent was older than the average person, Professor Smith took that into account in arriving at the value of $1.9 million for the decedent.

Professor Smith testified that the value of a person could "provide a basis for measuring the loss of society and companionship to all of society for an average person." Plaintiff's counsel then asked Professor Smith:

"[Counsel]: So what is your projected loss—your opinion on the value of the loss of love and affection sustained by John and the kids and the guidance and training of the kids?

[Professor Smith]: Well, I started with 1.9 million dollars. The next step that must be taken that I, as an economist, don't know how to take, but the trier of the fact, the Jury needs."

Later, plaintiff's counsel asked:

"[Counsel]: Now, I want you to assume that the Brock family was a loving, close-knit family. What should the Jury do with that additional assumption?

[Professor Smith]: As an economist, I don't have any expert knowledge into how they should take that into account. That is a decision they can make. That's something for them to do reaching into their own experience and their own hearts based on their own judgments. Economics doesn't know how to take that into account."

Thus, Professor Smith valued the decedent's life, but was unable to value the loss of affection and love to the decedent's spouse and the loss of parental training and guidance to the decedent's children. This value of decedent's life was to be used as a "basis" for the jury to evaluate the loss of affection, love, parental training and guidance sustained by the survivors.

■■■ A wrongful death action is provided for by statute in this state, IND.CODE § 34–1–1–2 (1988 Ed.). Since wrongful death actions are in derogation of common law, the statute creating this right of action must be strictly construed. *Andis v. Hawkins* (1986), Ind.App., 489 N.E.2d 78, 81. Thus, only those damages prescribed by statute may be recovered. *Id.* The purpose of the wrongful death statute is to benefit the survivors by providing compensation for the loss they have sustained. This statute was not created to compensate for the loss of life of the decedent.

■■■ Pecuniary loss is the foundation of the wrongful death action. *Id.* at 82. This loss can be determined, in part, from the assistance that the decedent would have provided through money, services or other material benefits. However, this loss also includes the loss to the children of parental training and guidance and the loss of love and affection to the surviving spouse. Judge Gillett in *Consolidated Stone Co. v. Staggs* (1905), 164 Ind. 331, 337, 73 N.E. 695, 697, discussed the measure of damages from wrongful death:

"Under a statute like ours, which gives a new right of action, distinct from that which the deceased might have maintained, the measure of damages is com-

pensation for the pecuniary loss sustained by the party or parties entitled to the benefit of the action. 'The sole inquiry is how many dollars are necessary to compensate the beneficiaries for the pecuniary loss caused to them by the wrongful death?' ... The damages are not to be estimated at the value of the life lost, but at such a sum as will compensate the persons on whose behalf the action is brought for the pecuniary injury which they have sustained by the death. [Citations omitted.]"

*See also Green v. Oakley* (1969), 145 Ind. App. 307, 310, 250 N.E.2d 594, 596.

The parties to this action understood that, under Indiana's wrongful death statute, damages could not be assessed for the lost pleasures of life to the decedent. (These damages are also referred to as hedonic damages.) The defendant Southlake had presented two motions in limine prior to trial. The first motion asked the court to bar any testimony from plaintiff's expert, Professor Smith, on the issue of the value of the decedent's life. The second motion requested the court to bar any testimony from this expert placing a monetary value on the loss of love and affection for the surviving spouse and the loss of parental guidance and training for the surviving children. Southlake's counsel argued that these damages were intangible and not within the expertise of the economist witness. The trial court denied both motions. Plaintiff's counsel agreed not to seek damages for the value of decedent's life.

Prior to the testimony of Professor Smith, Southlake's counsel objected to Professor Smith's testimony. This objection is rather confused since he agreed that plaintiff's counsel could offer testimony on the value of life as long as the terms hedonic damages, pleasures of life, and enjoyment of life were not used. This is in contradiction to the motions in limine. However, before Professor Smith began his testimony on the valuation of the decedent's life, Southlake's counsel did object, as in the motions in limine, to any mention of the value of life. Therefore, this issue was preserved for appeal.

Whether an expert economist's testimony valuing a decedent's life is admissible as an aid to the jury in determining the loss of affection, love, parental training and guidance to the survivors, is a novel issue in Indiana and appears to be a new issue nationally. As mentioned above, all of the testimony, regarding decedent's life expectancy, personal characteristics, future lost earnings and future lost household services, is not disputed. It is the expert economist Professor Smith's testimony valuing the decedent's life, based on the "willingness to pay" theory, that is contested. Southlake contends that this testimony was not an aid to the jury in valuing the loss of affection and love to the husband and the loss of parental training and guidance to the children and therefore, should not have been admitted. This Court agrees.

A similar issue was recently discussed in *Sterner v. Wesley College* (D.Del.1990), 747 F.Supp. 263. *Sterner* was a wrongful death case in which the plaintiffs offered the testimony of an economist to aid in valuing the intangible loss to the survivors. Coincidentally, the expert economist was Professor Smith. The plaintiffs argued that the hedonic value of the decedent's life could be considered as part of the damages recoverable for the mental anguish suffered by his survivors upon his death. The trial court refused to admit this testimony. The district court, in affirming this decision, stated:

"We find that the relevancy of evidence of the hedonic value of Christopher Sterner's life in regard to the mental anguish suffered by Carolyn and Michael Sterner is so attenuated as to be impermissibly speculative. Cf. Fed.R.Evid. 702 (limiting expert testimony to circumstances in which it 'will assist the trier of fact'). Such evidence would be overly speculative as a matter of relevancy and causation, and not just as a matter of uncertain measurement.

The issue in evaluating the mental anguish suffered by the survivors is not what loss of the pleasure of life the decedent might have suffered, but is rather the survivors' 'intense experience

we commonly refer to as the grieving process following the loss of a loved one.' ... To the extent that part of the survivors' mental anguish is their perception that it is tragic that the decedent's death cut short his enjoyment of life's pleasures, such evidence should be obtained through the testimony of the survivors who suffer such mental anguish, and not through statistical calculations of the value society may place upon the pleasure of living. [Citation omitted.]" *Id.* at 274.

Furthermore, the *Sterner* court noted that the proferred testimony did not even provide a measurement of the mental anguish suffered by the survivors.

"Moreover, plaintiffs have submitted a proffer of their expert's testimony concerning the hedonic value of the decedent's lost life (Docket Item 148) which indicates that the expert's formulations do not provide such a measure of the parents' mental anguish. Although plaintiffs argued in their briefs and oral arguments that they wished to present evidence of the hedonic value of Christopher Sterner's life as a component of the mental anguish suffered by his parents, ... the description of the bases and formulation of this evidence by plaintiffs' expert demonstrates that it could be presented only as a distinct basis for recovery and not as a measure of the parents' mental anguish. [Citation omitted.]" *Id.*

The plaintiffs in *Fetzer v. Wood* (1991), 211 Ill.App.3d 70, 155 Ill.Dec. 626, 569 N.E.2d 1237, proposed to have an expert economist, Professor Smith, testify regarding the economic evaluation of the deceased's loss of enjoyment of life as a component of the element of pain and suffering under Illinois' Survival Act. However, the trial court refused to allow this testimony. In affirming the trial court's decision on this issue, the *Fetzer* court stated that the expert testimony would be overly speculative and would serve to invade the province of the jury. The court reasoned that expert testimony on pain and suffering was not amenable to analytical precision.

The court explained that expert testimony is admissible when it will assist the trier of fact to understand the evidence or to determine a fact in issue. If it is a matter within the common knowledge and experience of jurors, expert testimony may be permitted when it assists the jury to comprehend or explain the subject. However, it is not permissible unless the subject is difficult of comprehension or explanation. *Id.*, 155 Ill.Dec. at 636, 569 N.E.2d at 1247.

The *Fetzer* court noted that the plaintiffs conceded that juries understand the concept of the economic value of life in a general sense. Since it was not clear that the testimony would aid the jury, the *Fetzer* court held the testimony properly excluded.

Likewise, in *Mercado v. Ahmed* (N.D.Ill. 1991), 756 F.Supp. 1097, the court would not allow the expert testimony of Professor Smith on the lost pleasures of life in a personal injury action. The court reasoned that the evidence may fail to assist the trier of fact to understand the evidence or determine a fact in issue "in a way more meaningful than would occur if the jury asked a group of wise courtroom bystanders for their opinion." *Id.* at 1103.

The case of *Sherrod v. Berry* (N.D.Ill. 1985), 629 F.Supp. 159, is discussed in *Sterner, supra*, at 273–274 and *Fetzer, supra*, 155 Ill.Dec. at 634, 635, 569 N.E.2d at 1245–1246.[1] Although *Sterner* refers to the district court opinion and *Fetzer* refers to the first Seventh Circuit opinion, the two courts agree that *Sherrod* is distinguishable.

The plaintiff's decedent in *Sherrod*, a black American, was killed by a caucasian police officer. A wrongful death action was filed alleging a violation of section 1983 of the Civil Rights Act (42 U.S.C.

---

**1.** The *Sherrod* case was originally affirmed, (7th Cir.1987), 827 F.2d 195, but later vacated, (7th Cir.1988) 835 F.2d 1222 (en banc). The case was then reversed and remanded for a new trial due to error concerning liability issues. *Sherrod v. Berry* (7th Cir.1988) 856 F.2d 802 (en banc).

§ 1983 (1988)). When a wrongful death action alleges a section 1983 action violation, the estate may recover damages for loss of life, conscious pain and suffering experienced by the decedent prior to death, and punitive damages, regardless of whether state law permits these damages to be awarded in a wrongful death action. *Bass by Lewis v. Wallenstein* (7th Cir.1985), 769 F.2d 1173, 1190.

The *Sherrod* court permitted expert testimony, given by Professer Smith, as to the economic value of human life. However, in distinguishing *Sherrod*, the *Sterner* court noted:

> "Court decisions concerning damages recoverable in section 1983 actions, in which unconstitutional acts caused a death and the particular deterrent policies of section 1983 are invoked, are inapposite to such actions based solely on state law." *Sterner, supra,* at 274.

The *Sterner* court advised that Delaware had specifically delineated the types of damages which are recoverable under tort law, and hedonic damages were not included. Furthermore, as discussed above, the court then held that such testimony was too attentuated to be of aid in determining the damages to the survivors.

Similarly, in *Fetzer*, the court found that even if *Sherrod* had retained precedential value, it did not apply since it did not involve an interpretation or application of Illinois law. It was therefore distinguishable on the grounds that it was a civil rights violation under section 1983 of the Civil Rights Act (42 U.S.C. § 1983 (1988)).

Expert testimony on the value of life should not have been admissible in this wrongful death case.[2] It could not provide a measure of the loss of love and affection to the surviving spouse nor of the loss of parental guidance and training to the surviving children. Professor Smith even testified to that effect. The most Professor Smith could do was place a value on the life of the decedent. His testimony regarding the loss felt by the survivors was inadmissible speculation.

■ Expert opinion should be admitted to aid the jurors in understanding facts. *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324. Therefore, Professor Smith's testimony should have been an aid to the jury in making its determination of the intangible losses to the survivors. It is simply not clear that this testimony could have been helpful to the jury. Since the jury is able to determine these losses from its own experiences and knowledge, and through the testimony of the survivors, Professor Smith's testimony invades the province of the jury.

Although we are sending this cause back for retrial, the next two issues may be presented at trial. Therefore, we will discuss these issues.

■ At trial, Southlake attempted to cross-examine Professor Smith on annuities. The trial court sustained plaintiff's objections to this questioning. (We need not address plaintiff's assertion of waiver to this issue, since we are discussing this issue to alleviate any potential problem at retrial.)

Plaintiff argues that Professor Smith never discussed annuities during direct examination and therefore, he did not "open the door" to this subject for cross-examination. However, annuities were a permissible subject for cross-examination in this case. Professor Smith testified as to the present value of plaintiff's damages during direct examination. Annuities are another way of calculating present value of damages. Since Professor Smith is an economist, he should have been familiar with this type of valuation. Therefore, a discussion of present value on direct examination will allow cross-examination of the expert on other methods of present value calculation.

Of course, to what extent examination on annuities is permissible has been discussed by many courts. As stated above, ques-

---

**2.** It matters not whether Professor Smith's testimony was labeled as the value of life, hedonic valuation, value of the lost pleasures of life, or value of the lost enjoyment of life; regardless of the labeling of the testimony, it appears that Professor Smith's testimony is consistent on the valuation. *See Fetzer, supra; Mercado, supra.*

tions on the use of annuities would have shown the jury that Professor Smith's method of calculating damages was not the only way to determine what amount would be sufficient to compensate the plaintiff. However, the Wisconsin court in *Herman v. Milwaukee Children's Hospital* (App. 1984), 121 Wis.2d 531, 361 N.W.2d 297, disallowed any specific cross-examination of the expert economist concerning the cost of an annuity. The court noted that there was a difference between using a mathematical annuity table to determine life expectancy and using a table showing the cost of annuity contracts paying various amounts for various life expectancies to establish the present value of future losses. The jury determined present value of future losses, but was not permitted to take into account how much can then be earned with the discounted sum through the use of annuity evidence. The court concluded that by allowing admission of annuity evidence to show present value, the jury could be misled into believing it must award a lesser sum than the present value of the future losses. *Id.*, 361 N.W.2d at 306.

The *Herman* decision was narrowed by a subsequent case, *Bychinski v. Sentry Ins.* (App.1988), 144 Wis.2d 17, 423 N.W.2d 178. The *Bychinski* court explained that *Herman* did not ban all annuity evidence. The trial court has the discretion to decide under what circumstances annuity evidence will be admitted. The court further recognized that cost of annuity evidence has been accepted as a factor in assessing damages under limited circumstances. *Id.*, 423 N.W.2d at 180.

The Illinois courts, while recognizing the *Herman* decision, allow annuity evidence to determine present cash value as long as the expert uses only neutral figures to describe to the jury the mathematical process. *Singh v. Air Illinois, Inc.* (1988), 165 Ill.App.3d 923, 117 Ill.Dec. 501, 520 N.E.2d 852. The court does not allow calculations based on facts in evidence.

*American Nat. Bank & Trust v. Thompson* (1987), 158 Ill.App.3d 478, 110 Ill.Dec. 886, 511 N.E.2d 1206. The mathematical process, using neutral figures, is admissible to aid the jury in establishing present value of damages sustained by the survivors. *Exchange Nat. Bank v. Air Illinois, Inc.* (1988), 167 Ill.App.3d 1081, 118 Ill.Dec. 691, 522 N.E.2d 146. While the jury is permitted to use the annuity tables to establish present cash value, the courts emphasize that the process of figuring the actual cash value is for the jury. The courts believe that to hold otherwise would "mislead the jury into accepting the hypothetical figure of another instead of an actual figure to be arrived at by them under the instructions, or a figure based on such use of 'annuity table as they might consider proper.'" *Lorenz v. Air Illinois, Inc.* (1988), 168 Ill.App.3d 1060, 119 Ill.Dec. 493, 497, 522 N.E.2d 1352, 1356.[3]

However, courts have allowed cost of annuity testimony to be admitted during trial. The federal court in *Scott v. U.S.* (9th Cir.1989), 884 F.2d 1280, held that cost of annuity testimony was relevant to present valuation of damages determination. The court agreed that the government, the defendant, was not asking the district court to require plaintiffs to pass up a lump-sum award in favor of purchasing an annuity. The government was only requesting the court to consider testimony regarding the cost of purchasing a single premium annuity as a measure of the present value of the economic losses. *Id.* at 1287.

Similarly, other courts have permitted cost of annuity testimony. *See Guinn v. Kansas City Southern Railway Co.* (1975), Okla.App., 547 P.2d 1310 (testimony of the cost of a single premium annuity policy which would pay plaintiff's average monthly wages based upon life expectancy of person of plaintiff's age allowed); *Gulf, Colorado & Santa Fe Railway v. Hamp-*

---

**3.** In each of the cases involving Air Illinois, the annuity testimony of the insurance broker was disallowed on the grounds that his final quotations were based on outside sources and therefore, he could not be effectively cross-examined as to the basis and legitimacy of his testimony. *Singh, supra.* Moreover, the defendant had a witness testifying on its behalf regarding computation of present cash value. *Id.*

*ton* (1962), Tex.Civ.App., 358 S.W.2d 690 (cost of annuity testimony is admissible in determining damages); *Missouri–Kansas–Texas Railroad Co. v. Wright* (1958), Tex. Civ.App., 311 S.W.2d 440 (jury may consider cost of annuity information as long as evidence relates to amount of income decedent would reasonably expected to receive had he lived); *Texas & New Orleans Railroad Co. v. Jacks* (1957), Tex.Civ.App., 306 S.W.2d 790 (cost of annuity testimony admissible); *see also* Annot., *Cost of Annuity as a Factor for Consideration in Fixing Damages in Personal Injury or Death Action*, 53 A.L.R.2d 1454 (1957), and supplements.

A recent case, *Cornejo v. State* (1990), 57 Wash.App. 314, 788 P.2d 554, allowed cost of annuity testimony by an expert economist. The court acknowledged that costs of annuities are facts that would be used generally by economists and financial planners in many contexts. For instance, annuities are commonly used in structured settlements. Therefore, the expert's testimony could not be excluded on the grounds that these facts are not "reasonably relied upon" by economists.

The appellant, in *Cornejo*, also argued that the expert's testimony invaded the province of the jury by using actual figures in his testimony. However, the court permitted this testimony relying on Fed. R.Evid. 704, which allows opinion evidence on an ultimate issue to be decided by the jury. To the extent that the economist relied on hearsay statements of others regarding the costs of annuities, the court permitted this reliance on hearsay pursuant to Fed.R.Evid. 703. Fed.R.Evid. 703 allows experts to testify using facts or data reasonably relied upon by experts in the particular field and these facts or data need not be admissible in evidence.

The *Cornejo* court recognizes the holding in *Herman, supra,* but refuses to follow this approach on the basis that *Herman* assumes an annuity cost is necessarily different from the present value figure as calculated by the jury. The court further explained that the cost of an annuity, which carries interest at a known rate and

may provide for yearly increases to account for expected inflation, is relevant evidence of the present value of future losses. "The cost of an annuity thus is not a different, lesser amount, but is evidence to be considered by the jury in determining present value." *Cornejo, supra,* 788 P.2d at 562.

Additionally, the *Cornejo* court acknowledged that the Illinois courts subscribe to the view that actual figures and calculations should not be done by the expert, but is a job left for the jury. However, the Federal Rules of Evidence permit the expert to state his opinion on an ultimate issue to be decided by the jury and without prior disclosure of the underlying facts. The opposing party to this testimony may then question the basis of the opinion.

Although *Cornejo* relied on the Federal Rules of Evidence and Indiana is a common-law state, our case law establishes evidentiary rules similar to the federal rules. For instance, the court in *DeVaney v. State* (1972), 259 Ind. 483, 288 N.E.2d 732, abolished the rigid rule which had disallowed expert opinion as to an ultimate fact to be decided by the jury and made this testimony permissible. Experts are also allowed to base their opinions upon evidence that has not been admitted. *Morris v. State* (1977), 266 Ind. 473, 364 N.E.2d 132. Additionally, an expert may rely upon hearsay or personal observations to formulate an opinion provided that the hearsay relied upon is of the type which is customarily relied upon by such experts. *Clouse v. Fielder* (1982), Ind.App., 431 N.E.2d 148.

A party should be permitted to question an expert regarding alternative means of formulating the present value of damages. One alternative method is an annuity. Indiana has held that annuity tables are admissible in conjunction with instructions on the use of present value in computing future damages. *Eversole v. Consolidated Rail Corp.,* (1990), Ind.App., 551 N.E.2d 846. Questioning regarding annuities and the cost of annuities is relevant to determining present value of damages. An expert should be allowed to render an opinion using actual figures, even if the testimony embraces an ultimate issue to be decided

by the trier of fact. The trier of fact is capable of viewing such testimony, along with all other testimony on the present value of damages, and making a decision. Straight forward proof of this sort does not invade the province of the jury. Furthermore, opposing counsel may question the basis of the expert's annuity testimony. Opposing counsel may present evidence of a different rate or question whether the cost includes such additional costs as sales commission, profit, or overhead.

In conclusion, Southlake should have been allowed to cross-examine plaintiff's expert on annuities. Plaintiff's expert had already testified as to a method of formulating the present value of damages. Therefore, Southlake should have been permitted to question the expert on a different method of figuring damages.

Southlake also asked this Court to review one of the final instructions given by the trial court. Once again, since this Court is addressing this issue to prevent a future problem at retrial, it is not necessary to address whether Southlake made a proper objection at trial so as to preserve the issue for appeal.

Final Instruction No. 7 given at trial read as follows:

"In determining damages which you may award to the plaintiff, you are instructed that the burden is on the plaintiff to prove damages by a preponderance of the evidence. However, where damages cannot be defined and calculated with mathematical certainty or by any exact standard such as the assessment of damages for loss of intangibles regarding loss of care, love and affection and loss of parental training and guidance, the plaintiff need only furnish evidence of sufficient facts and circumstances to permit an intelligent and probable determination thereof allowing you to make such an assessment of damages using sound and liberal discretion."

Southlake argued that there were two problems with the instruction. First, Southlake contends the instruction unduly emphasized the intangible damages by specifically mentioning them. In support of

its argument, Southlake relies on a personal injury case, *Plan–Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212, in which Wiggins, the plaintiff, was suing for injuries he sustained when the scaffold on which he was working collapsed. The court refused to give a final instruction, tendered by the defendant, Plan–Tec, which listed selected admissions of the plaintiffs. These admissions tended to unduly emphasize certain aspects of the alleged contributory negligence of the plaintiff. The admissions also were self-serving to the defendant. For instance, although Plan–Tec's instruction stressed that plaintiff was not wearing a safety belt at the time of the accident, the instruction did not reveal that testimony at trial revealed that there were no belts available. The reviewing court noted that "an instruction which singles out or gives undue prominence to a particular fact or evidence is erroneous." *Id.* at 1227, citing *C. & E.I. Railroad Co. v. Alexander* (1955), 126 Ind.App. 75, 79–80, 125 N.E.2d 171, 173, *trans. denied.*

In *C. & E.*, the plaintiff was struck by a train while crossing a grade in his automobile. The trial court refused to give the railroad's instruction, which stated that "[i]f you find it to be a fact that it was broad day light [sic] at the time the collision occurred and that plaintiff did not see the train, then you have a right to take this fact into account in determining whether plaintiff looked with reasonable care." *Id.* at 79, 125 N.E.2d at 173; *Plan–Tec, supra,* at 1227–1228. The *C. & E.* court determined that "[t]he fact of its being daylight when the collison occurred, standing alone, is of such meager probative value on the question of the appellee's conduct in looking for an approaching train that the instruction gives it undue emphasis and it was properly refused." *C. & E., supra,* 126 Ind.App. at 79–80, 125 N.E.2d at 173; *Plan–Tec, supra,* at 1228.

In the instruction in this case, the trial court simply explained what was meant by "intangible" damages while instructing on the burden of proof. This instruction does not place undue emphasis on a particular fact or evidence. It just

clarifies those damages that cannot be defined and calculated with mathematical certainty or by any exact standard. The instruction does not make these damages "uniquely important" as argued by Southlake.

■ However, this Court agrees with Southlake's second contention that the burden of proof for these "intangible" damages is unclear. In fact, the instruction could mislead or confuse the jury into believing that the burden of proof was less than a preponderance of the evidence for the "intangible" damages. *See Public Service Indiana, Inc. v. Nichols* (1986), Ind. App., 494 N.E.2d 349 (misleading and confusing instructions should be refused). The instruction conveys the idea that the plaintiff is required to prove damages by a preponderance of the evidence unless the damages could not be proven by mathematical certainty. The instruction should be more articulately drawn to make clear to the jury that there is only one burden of proof, a preponderance of the evidence. Along with instructing the jury that "intangible" damages may be considered even though they are not subject to exact measure, the court should also instruct the jury that its verdict may not be based on guess or speculation. *Nahmias Realty, Inc. v. Cohen* (1985), Ind.App., 484 N.E.2d 617.

Reversed and remanded for a new trial in accordance with this opinion.

GARRARD, J., concurs.

BAKER, J., dissents with opinion.

BAKER, Judge, dissenting.

I respectfully dissent.

While I agree with the majority that Professor Smith's testimony on hedonic damages was improper under Indiana law and should have been excluded, I believe its admission was harmless error not necessitating reversal. As I view it, the issue is not whether the testimony was improper, but rather, given that it was improper, whether we can say it produced a verdict tainted by excessive intangible damages.

As the majority correctly states, damages in a wrongful death action are limited to the pecuniary losses of the decedent's survivors. *Andis v. Hawkins* (1986), Ind. App., 489 N.E.2d 78, *trans. denied.* These losses include the intangible losses of love, care, and affection to surviving spouses and children, as well as the loss of training and guidance to minor children. *Id.* at 82. These intangible losses, as Southlake and Brock agreed, are not proper subjects for expert testimony. Questions of love and affection are matters within the common experience of jurors, and few people, if any, can be said to possess enough specialized knowledge in such matters to give testimony cloaked with the title of "expert." *See Summers v. State* (1986), Ind. App., 495 N.E.2d 799, 802, *trans. denied.*[1]

The record reveals several items that refute the idea the verdict was tainted. The evidence showed Brock's damages resulting from Mrs. Brock's lost wages and the value of her household services were approximately $500,000. *Record* at 390, 395, 405. Quite reasonably, this was the figure Southlake suggested would make a fair award. *Record* at 171. Just as reasonably, Brock added in the intangible losses of love, affection, and services, and requested $2.5 million. *Record* at 164. The experts then had their opportunity to comment, but both refused. Professor Smith said the decision on the amount of intangible losses was "something for [the jury] to do reaching into their own experience and their own hearts based on their own judgments." *Record* at 419. Southlake's expert agreed that intangible losses were not amenable to precise expert evaluation, *Record* at 477, but also agreed no amount of money could compensate for the loss of a dearly loved spouse. *Record* at 512. Finally, there was a good deal of testimony concerning the happiness of the Brocks'

---

1. That love and affection are matters within the common experience of juries does not automatically preclude the use of expert testimony. *Id.* Love, affection, and the value of familial relationships, though, are *so* well ingrained in all of us that the use of expert testimony on these questions strikes me as especially inappropriate.

marriage, the sadness of the loss,[2] and the loving, nurturing nature of the relationship between the children and their deceased mother. *Record* at 180, 582–84, 614.

Thus, the majority's analysis, correct in the abstract, runs headlong into three hard and fast rules applicable to the facts of this case. First, we will not reverse an award of damages that is within the scope of the evidence before the jury. *Persinger v. Lucas* (1987), Ind.App., 512 N.E.2d 865, 868. Second, we will not deem a damages award excessive unless it is affirmatively shown to be the result of "prejudice, passion, partiality, corruption, or some other improper element." *Id.* Third, the jury is free to reject the testimony of an expert witness. *Ferdinand Furniture Co., Inc. v. Anderson* (1980), Ind.App., 399 N.E.2d 799, 807.

In my opinion, the $1.5 million award here was within the scope of the evidence, given the intangible portion of the damages proved. Moreover, Southlake has not shown the jury was improperly influenced by Professor Smith's testimony; Southlake's argument proves nothing more than that the testimony on hedonic damages was improper. Especially compelling, however, is the third rule. Southlake's trial counsel advised the jury it was free to disregard the testimony of both experts, and to reach its own valuation of damages. *Record* at 622.[3] This is exactly what the jury did: it rejected the plaintiff's $2.5 million and the defendant's $500,000 and awarded $1.5 million. I do not think Southlake should be heard now to complain that the jury did as Southlake requested, and for this and the other reasons I have discussed, I would let the verdict stand.[4]

My decision to let the verdict stand is not altered by Instruction No. 7 for the simple reason that when all the instructions are read together, they clearly inform the jury of the plaintiff's duty to prove each element of the case by a preponderance of the evidence. *Record* at 628–30. We must review instructions as a whole and in harmony with one another. *Wielgus v. Lopez* (1988), Ind.App., 525 N.E.2d 1272. If an instruction is deemed to be erroneous, we will nonetheless not find reversible error if, in light of all the instructions given, the erroneous instruction could not have misled the jury. *Spratt v. Alsup* (1984), Ind.App., 468 N.E.2d 1059.

Here, the jury could not have been misled. Even if Instruction No. 7 was erroneous, the other instructions concerning the plaintiff's burden of proof render any error harmless.

I dissent and vote to affirm the judgment of the trial court.

---

2. Mrs. Brock was killed on her 18th wedding anniversary. She and Mr. Brock had plans to go out that evening. *Record* at 589.

3. The judge also instructed the jury that it was free to disregard the experts' testimony. *Record* at 632.

4. I agree with the majority that Southlake should have been allowed to cross-examine Professor Smith on the subject of annuities. It follows from my main conclusion, however, that the refusal to allow cross-examination on this subject was also harmless error. Additionally, I am not persuaded Southlake considered the annuity subject of great importance prior to the writing of its appellate brief since counsel for Southlake did not question Southlake's own expert on the subject of annuities.